HAGGARD DRILLING, INC., A CORPORATION, APPELLANT, V.
RALPH W. GREENE ET AL., APPELLEES.

236 N. W. 2d 841

Filed December 31, 1975. No. 40117.

McGinley, Lane, Mueller, Shanahan, McQuillan &
Gale, for appellant.

Curtis & Curtis and Owens & Owens, for appellees
Maddux.

Heard before SPENCER, MCCOWN, and NEWTON, JJ.,
and COLWELL and IRONS, District Judges.

COLWELL, District Judge.

This is a suit to recover $13,219.60 as the unpaid balance due for drilling five irrigation wells. Plaintiff claims three theories of recovery, express contract, implied contract, and quasi-contract based upon unjust enrichment. Defendant Ralph W. Greene was not served with process; he did not appear. The default of defend-

ant Edward L. Lewis was entered. Issues were joined as to defendants Maddux, and trial thereon was had to the court. Judgment was entered for defendants Maddux. We affirm.

On April 17, 1970, defendants Thomas A. Maddux and Helen Maddux, husband and wife, as sellers, by written option and agreement, granted to Ralph W. Greene and Edward L. Lewis an option to purchase a 3,800-acre ranch in Hayes County, Nebraska, hereafter called the Palisades Place. At the time the sellers lived on another nearby ranch property called the Enders Place. Both ranch properties were titled in the name of Thomas A. Maddux. Buyers were residents of Colorado. The material parts of the option are: "It is mutually agreed that the consideration for this option shall be that the Buyers shall, at their own expense, procure to be drilled, gravel packed and capped in a good and workmanlike manner in keeping with the standards of the area a total of twelve irrigation wells: seven of these wells shall be located upon the Sellers home place and five of these wells shall be located upon the real estate hereinabove described. It is further agreed that the Buyers shall make arrangements on the day of execution of this agreement with Haggard Drilling Company of Imperial, Nebraska, to do this work and the Buyers shall make all arrangements for the payment to the driller and shall hold harmless the Sellers from any cost or loss caused thereby. * * * In the event that the Buyers shall elect to exercise their option to purchase the hereinabove described real estate under the terms hereinafter set forth, then they shall have credit for the cost of the seven wells drilled on the Sellers home place, but they shall have no credit for the five wells drilled on the hereinabove described real estate, on the total purchase price. * * * In the event the Buyers elect to exercise their option to purchase the real estate, then the Sellers agree to sell to the Buyers and the Buyers agree to buy from the Sellers

the hereinabove described real estate for the good and valuable consideration of money to be paid, acts to be performed and promises to be kept, the value and sufficiency whereof as consideration being mutually herewith acknowledged by the execution of this instrument, under the following terms and conditions: * * * A. 1. The Buyers shall have the right to purchase said real estate for the cash purchase price of $380,000.00, * * * 2. Alternatively, the Buyers shall have the right to purchase said real estate for the installment sale price of $400,000.00, which shall be payable as follows: * * * a. The Buyers agree to purchase real estate of a cost of $50,000 or less as designated by the Sellers and to exchange the same as a part of this transaction in such manner as shall be most advantageous to the Sellers for tax purposes and which shall not increase the total cost of the Buyers. * * * b. On November 1st, 1970, to pay to the Sellers a sum of money equal to 29% of the installment sale price after the purchase hereinabove described at A. 1. a. * * * This sum of money shall be diminished by the cost of the seven irrigation wells on the Sellers home place as described in the option consideration. * * * H. In the event the Buyers fail to accept the option hereinabove granted, then the improvements accomplished by the twelve irrigation wells hereinabove described shall be the sole property of the Sellers, and the Buyers shall have no further liability to the Sellers arising from the option portion of this agreement."

The deadline for exercising the option by the buyers or other persons they might direct was May 18, 1970. After executing the option defendant Helen Maddux did nothing more concerning that instrument, its terms, or its performance.

On April 17, 1970, Greene, Lewis, and Thomas A. Maddux talked to Jon Elson, manager of the Haggard & Sargent Drilling Company at its office in Imperial, Nebraska, concerning the drilling of 12 irrigation wells

as provided in the option. Shortly thereafter there were more than two other conversations on the same subject matter between Lewis, Greene, and Elson. A copy of the option was exhibited to Elson; he read parts of it; and he understood the ownership of the lands involved and the relationship of the parties to the option, particularly, that the buyers had the sole obligation to secure the drilling of 12 wells and pay for the same. Elson submitted the drilling proposition to the board of directors of the Haggard & Sargent Drilling Company, which generally approved its acceptance and understood the buyers were to pay for the wells. Thereafter it was orally agreed between Elson, acting for the Haggard & Sargent Drilling Company, and Lewis and Greene for the Spring Creek Land and Cattle Company to drill the 12 wells as provided in the option. It was understood and agreed that Lewis and Greene were obligated to pay for the well drilling on the basis of reasonable charges, less 5 per cent discount for volume and the making of payments every 30 days. There was no understanding between any of the parties that the sellers were to pay or underwrite or guarantee the payment for any of the wells drilled; and there is no evidence in the record that sellers at any time represented to the driller or its agent that they would pay for any such service or material.

On September 22, 1971, the interests of the Haggard & Sargent Drilling Company were merged into Haggard Drilling, Inc., plaintiff. Both companies will hereafter be called plaintiff. Plaintiff had enjoyed many years of active drilling work in the Hayes County area.

Beginning on May 1, 1970, and continuing through June 5, 1970, test wells were drilled, logs prepared for 12 wells, and 5 wells were drilled with casing. Three of the drilled wells were on the Enders Place and two on the Palisades Place. During this time Thomas A. Maddux was occasionally present observing the drilling work and, at times, he did make suggestions as to the

location of some of the wells and the drilling work. He did not assume the role of directing the drilling work and he made no representation contrary to any term of the option.

On May 18, 1970, Lewis alone exercised the option by giving notice in writing to Thomas A. Maddux that he elected option A (2), to purchase the land. Greene did not thereafter participate in any of the matters relating either to the well drilling, or the option, and at the time of trial his whereabouts was unknown. No notice was given to the plaintiff or its agent that Lewis, individually, exercised the option; however, thereafter all contact by plaintiff concerning the drilling transaction was had with Lewis, personally, or the Spring Creek Land and Cattle Company, Lakewood, Colorado, which was a corporation established by Lewis for the purpose of managing the Palisades Place. At the time the option was exercised Lewis assumed possession of the land described in the option, which included the assignment to Lewis by the sellers of an existing agister's contract covering 1,000 head of cattle, the proceeds of which were to be divided 10 per cent to the sellers for managing, and 90 per cent to Lewis.

Plaintiff stopped drilling work on June 5, 1970, because Lewis failed to pay for the work as agreed. Statements for unpaid drilling work were sent to the Spring Creek Land and Cattle Company, at Lakewood, Colorado, which is the same address as that of defendant Lewis. The statements were sent on May 20, June 4, and June 16, 1970. In response to the last statement Lewis returned it to plaintiff along with a $2,500 payment, leaving a balance due of $12,433.62, and his notation "Balance to follow in 10 or 15 days * * * Thanks. Ed Lewis." Another statement was sent to Lewis on September 30, 1970; however, the balance due was then shown as $13,219.60 since plaintiff then added to the account the 5 per cent discount previously granted. No other payment was ever made by Lewis

for drilling charges. No statement of account was ever sent to either of the defendants Maddux and no formal demand of them was made prior to the filing of this suit on September 27, 1972.

The well registration forms for filing with the Nebraska Department of Water Resources were prepared by the plaintiff and sent (1) for the Enders wells to Thomas A. Maddux, and (2) for the two Palisades wells to Lewis who, in turn, forwarded them to Maddux.

Lewis made attempts to secure financing to complete the option and as late as November 1970, stated that he intended to complete the contract terms. However, he defaulted, and the record indicates that he is judgment proof. There has been no accounting between Lewis and Thomas A. Maddux on the agister's contract.

Plaintiff never filed or attempted to file a mechanic's lien. The petition in this action was filed September 27, 1972.

On March 31, 1972, Thomas A. Maddux and Helen Maddux were divorced. As a part of the decree 320 acres of the Palisades Place was awarded to her. One of the wells in question here was located on this 320 acres.

Both express and implied contracts have their foundation in the consent of the parties. At oral argument plaintiff did not urge its right of recovery on either the theory of express contract or implied contract. "The judgment of the trial court in an action at law where a jury has been waived has the effect of a verdict of a jury and it will not be set aside unless clearly wrong." Wonderling v. Conley, 182 Neb. 446, 155 N. W. 2d 349. The trial court properly held that there was no evidence of a contract either express or implied in law between plaintiff and defendants Maddux.

We next consider plaintiff's theory to recover on quasi-contract based upon unjust enrichment flowing to defendant Maddux. There is little controversy in the evidence. We consider this issue de novo.

"A quasi contract is a contract implied in law and usually has its origin in the principle that a person shall not be allowed to enrich himself unjustly at the expense of another. 17 C. J. S., Contracts, § 6, p. 566. Where benefits have been received and retained under such circumstances that it would be inequitable and unconscionable to permit the party receiving the benefits to avoid payment therefor, the law required the party receiving and retaining the benefits to pay the reasonable value of them." Bush v. Kramer, 185 Neb. 1, 173 N. W. 2d 367.

"The law will not imply a promise against the express declaration of the party to be charged, made at the time of the supposed undertaking, unless such party is under legal obligation paramount to his will to perform some duty, and he is not under such legal obligation unless there is a demand in equity and good conscience that he should perform the duty." 66 Am. Jur. 2d, Restitution and Implied Contracts, § 2, p. 944.

"The mere fact that a third person benefits from a contract between two other persons does not make such third person liable in quasi contract, unjust enrichment, or restitution. Moreover, where a third person benefits from a contract entered into between two other persons, in the absence of some misleading act by the third person, the mere failure of performance by one of the contracting parties does not give rise to a right of restitution against the third person." 66 Am. Jur. 2d, Restitution and Implied Contracts, § 16, p. 960.

The acts and services of plaintiff did confer upon defendants Maddux a benefit which improved their land and its use; that benefit was contemplated by the terms of the option, and all parties understood those terms. This is expressed by Elson: "Q. Is it correct that you said there was never any time when Tom Maddux ever said that he would underwrite or pay for these five wells, is that correct? A. He wasn't going to pay for them. Q. And he never said that at any time

did he? A. Nope. Q. And did you say that you had read the basic part of this option and agreement, and did you understand from reading that that this was to be in the terms of the agreement at the expense of Lewis and Green for the drilling of the wells? A. That's right." Elson also testified: "Q. Then you did send statements only to Spring Creek Land and Cattle Company in care of Ed Lewis in Denver? A. That's right. Q. No demand was made upon Mr. Maddux until the month of October (1970) or thereafter, is that right, of that year? A. After we couldn't get any money out of them, we started on Tom."

Although defendants Maddux did recieve a benefit, by the terms of the option, they did have a change of position in that they gave up possession of the Palisades and were prevented from exercising all incidents of ownership until after default was made on November 1, 1970. There is also the further consideration of laches as relates to the divorce decree affecting defendants Maddux.

The failure of Greene and Lewis to be responsible credit risks cannot be a basis to provide equitable relief absent either fraud, misrepresentation, or wrongful conduct on the part of defendants Maddux; we find none of these present here. Defendants Maddux was not unjustly enriched. Judgment affirmed.

AFFIRMED.