674 A.2d 534

**BENNETT HEATING & AIR CONDITIONING, INC. et al.**

**v.**

**NATIONSBANK OF MARYLAND et al.**

**No. 72 Sept. Term, 1995.**

Court of Appeals of Maryland.

April 11, 1996.

James T. Draude (Driscoll & Draude, on brief), Washington, DC, for Petitioner.

Mark S. Carlin (Sherman, Meehan & Curtin, P.C., on brief) Washington, DC, Constantinos G. Panagopoulos (F. Joseph Nealon, Eric C. Lund, Ballard Spahr Andrews & Ingersoll, on brief), Washington, DC, for Respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RODOWSKY, Judge.

We granted cross-petitions for certiorari in order to review the judgment of the Court of Special Appeals in two appeals (Nos. 899 and 900, September Term, 1994) from the Circuit Court for Prince George's County. *Bennett Heating & Air Conditioning, Inc. v. NationsBank of Maryland,* 103 Md.App. 749, 654 A.2d 949 (1995). The plaintiffs are unpaid subcontractors whose mechanics' liens, or potential claims for such liens, were extinguished by the foreclosure of a senior mortgage. In a plenary civil action (No. 899) the plaintiffs primarily sought money judgments for restitution from the foreclosure purchaser and its mortgage lender in the amount of the increased value of the property attributable to the plaintiffs' unpaid work. Plaintiffs also sought to set aside the enrolled judgment of ratification of sale in the foreclosure action (No. 900) by a third amended complaint filed in the plenary action and by attempting to consolidate the two actions. For the reasons set forth below we agree with the circuit court which held that the complaint failed to state claims for which the relief of restitution, or of avoidance of the ratification judgment, can be granted.

The circuit court's judgment in the plenary action was entered on motions filed by the defendants to dismiss the third amended complaint of the plaintiffs on the face of that pleading. See Maryland Rule 2–322(c). Consequently, in that action we consider the facts to be those that are well pleaded by the plaintiffs, including those facts that may fairly be inferred from the matters expressly alleged. In the appeal in the foreclosure action we additionally consider the facts of record that underlie the judgment in that summary action.

In overview, the dispute involves a business park in Prince George's County, the development of which began in 1987. The developer, a limited partnership which owned only the business park (the Property), had as its general partner a corporation which owned nothing other than its interest in the limited partnership. Debt financing for the undertaking was furnished by a predecessor of NationsBank of Maryland (the Bank) which was secured by a mortgage on the Property. Five buildings for office, commercial and/or warehouse use were successfully completed. The difficulties with which we are concerned arose with the construction of the sixth building, Building F.

The general contract for the construction of Building F was let in November 1989. In the course of constructing Building F, the developer did not fully pay the general contractor, and the general contractor did not fully pay the subcontractors. There were negotiations between the developer and the Bank "to fund the construction of Building F and to re-negotiate the financing on the Property." By June 1990 a tenant had been acquired for a portion of Building F, and an additional contract was made between the developer and the general contractor for work in the tenant's space. This led to additional subcontracts relating to the tenant's space. The developer did not pay the general contractor for tenant space work, and the general contractor did not pay the subcontractors for their tenant space work.

The Bank foreclosed. Two of the subcontractors had established mechanics' liens prior to the foreclosure sale, but there

was no surplus over the mortgage debt. A subsidiary of the Bank bought in at the sale and assigned its rights as purchaser to a new entity which acquired the Property by utilizing, largely but not exclusively, funds borrowed from the Bank on the security of a new mortgage on the Property. The assignee-purchaser is a Maryland limited partnership, the sole general partner of which is a Maryland corporation. The only asset of this new entity is the Property, and the only asset of its corporate general partner is the general partner's interest in the new limited partnership. Plaintiffs allege that the investors in the old and the new limited partnerships and their respective corporate general partners are the same individuals. The plaintiffs refer to them as the "British Investors."

Specifically, the general contractor for Building F was Michael, Harris & Rosato Brothers, Inc. (MHR). The contract price was $1,427,529. MHR is not a plaintiff in this action. The plaintiffs are the heating, ventilating and air conditioning subcontractor, Bennett Heating & Air Conditioning, Inc. (Bennett), the electrical subcontractor, D & L Electric, Inc. (D & L), the automatic fire sprinkler system subcontractor, the floor covering subcontractor, and the plumbing subcontractor. The subcontractors have not been paid for work both on basic Building F and on the tenant space. The largest claim, that of Bennett, exceeds $325,000.[1]

Specifically, the defendants in this action are the Bank, as successor to Sovran Bank/Maryland; the original developer entity, Ammendale Business Campus Limited Partnership (Ammendale LP); Ammendale LP's general partner, ELV/Ammendale I, Inc.; a limited partner in Ammendale LP, Carfax Enterprises Limited Partnership; the new developer

---

1. In Count V of the third amended complaint the installer of site lighting alleged a direct contract with the original developer and in Count VII the floor covering contractor alleged a direct contract with the original developer. The circuit court dismissed those counts of the complaint. The Court of Special Appeals reversed the dismissal of those counts. *Bennett Heating & Air Conditioning, Inc.,* 103 Md.App. at 767–70, 654 A.2d at 958–59. That ruling by the Court of Special Appeals on Counts V and VII was not the subject of any issue in the petitions for certiorari, and that ruling is not before this Court.

entity, Banbury Associates Limited Partnership (Banbury LP); and Banbury's general partner, Banbury Real Estate Investment, Inc.

Plaintiffs allege that work by Bennett was completed in July 1990 and by the other plaintiffs by June of that year. Bennett established its mechanic's lien on November 28, 1990. The Bank's foreclosure was docketed on March 6, 1991. At that time the full mortgage indebtedness of $21,500,000 was due, together with interest of $966,455.03 through March 3, 1996 and late charges of over $1,125,000. D & L established its mechanic's lien on March 15, 1991. The mortgage foreclosure sale was held on March 22, 1991.

A subsidiary of the Bank bought in at the auction for $21,050,000 and assigned its rights to Banbury LP.[2] The sale was ratified on May 3, 1991. The sale price did not produce any surplus distributable to junior lienors. Banbury LP borrowed $18,675,000 from the Bank to settle on the purchase and, thus, Banbury LP obtained $2,375,000 of capital from sources other than the Bank in order to complete the purchase. Plaintiffs allege that Banbury LP also agreed to pay the Bank up to $3,479,038 in " 'additional yield' . . . depending on the proceeds that Banbury LP derived from the Property in the future." In addition, the Bank loaned Banbury LP $1 million "to finance additional improvements to the Property."

The initial complaint was filed against all of the defendants in November 1991. Additional parties joined as plaintiffs in the first and second amended complaints. These complaints alleged that the defendants had been unjustly enriched by the labor and materials furnished by the plaintiffs for which the plaintiffs had not been paid, but which the defendants enjoyed in the form of enhanced value in Building F. In the course of

---

2. In an affidavit in support of a motion for summary judgment filed by the Bank in the course of this action, the Bank stated that it lost over $2,350,000 on the foreclosure sale. The judgment appealed from by plaintiffs in the plenary action was not based on a summary judgment, so that we do not consider the summary judgment evidentiary materials in the appeal in the plenary action.

the proceedings the Bank, in April 1992, was dismissed from the case. That judgment, however, was never certified as final, and it remained interlocutory. See Md.Rule 2–602. In November 1993 plaintiffs moved to vacate the judgment dismissing the Bank, and that motion, among others, was heard in December 1993.

At that hearing plaintiffs explained that the remaining defendants were asserting that they could not have been unjustly enriched by the plaintiffs' labor and materials because the public auction sale price conclusively determined the value of the Property. The plaintiffs wanted the Bank back in the case so that they could challenge the sale. The circuit court expressed skepticism concerning the possible success of that tactic ("When you buy at an auction on the courthouse steps how could you be unjustly enriched irrespective of what went on before? It's all wiped out."). The plaintiffs represented to the circuit court that they had information that Ammendale LP and the Bank had colluded for the purpose of wiping out the mechanics' liens and that the British Investors continued to own the Property. The circuit court postponed the impending trial of the action so that the plaintiffs could file a third amended complaint, and the court reinstated the Bank as a defendant.

In that amended complaint the plaintiffs added a new Count I alleging the following:

"28. The Foreclosure Sale was a sham conducted pursuant to collusion between the mortgagor and the mortgagee in order to cut off the mechanics' lien rights of MHR and plaintiffs. The British Investors, who owned and controlled Ammendale LP (the mortgagor), and NationsBank (the mortgagee) agreed in advance to the Foreclosure Sale, agreed on the price to be bid at the Foreclosure Sale, agreed that NationsBank would sell the Property back to the British Investors at that agreed price, and agreed that NationsBank would lend the British Investors the funds necessary to re-purchase the Property.

"29. The Foreclosure Sale was used by defendants as a mechanism to transfer the Property from one set of entities owned and controlled by the British Investors (Ammendale LP and ELV/Ammendale) to another set of entities owned and controlled by the British Investors (Banbury LP and Banbury Investment) in an attempt to avoid paying MHR and plaintiffs for the work done on Building F."

Plaintiffs also filed in the mortgage foreclosure action a motion to consolidate that action with the plenary civil suit. The purpose of the motion to consolidate was to direct the allegations of Count I of the third amended complaint to the judgment of ratification of sale. Consequently, we consider the motion to consolidate as a petition in the mortgage foreclosure action to set aside the ratification on the grounds stated in Count I.

The defendants, including the Bank, moved to dismiss the third amended complaint. After a hearing, the circuit court dismissed the third amended complaint for failure to state claims on which relief could be granted, and the circuit court denied the motion to consolidate that was filed in the foreclosure action. Plaintiffs appealed to the Court of Special Appeals from both judgments.

The Court of Special Appeals held that the allegations of Count I were legally sufficient to permit further proceedings on the claim seeking reopening of the ratification of sale. *Bennett*, 103 Md.App. at 763, 654 A.2d at 956. We shall consider the sufficiency of the Count I allegations in Part II, *infra*. The Court of Special Appeals then held that the allegations of unjust enrichment were not legally sufficient, whether or not the foreclosure sale would be set aside on remand. *Id.* at 765–66, 654 A.2d at 957. If the sale were not set aside, Ammendale LP would no longer own the Property and would not be benefitted. *Id.* at 765, 654 A.2d at 957. Similarly, the new owner, Banbury LP, and its lender, the Bank, would not be unjustly enriched because the undisturbed foreclosure sale would establish that Banbury LP had paid fair market value. *Id.* On the other hand, if the foreclosure sale

were set aside, then the ownership of the Property would revert back to Ammendale LP, but there was no allegation that Ammendale LP dealt directly with the plaintiffs or misled the plaintiffs into believing that Ammendale LP, as opposed to the general contractor, would be responsible for paying for the labor and materials. *Id.* at 766, 654 A.2d at 957.

We granted cross-petitions for certiorari that sought further review in both appeals. We shall initially consider the issues relating to unjust enrichment.

I

"At the outset, [plaintiffs] emphasize, that it is *not* necessary to set aside the Foreclosure Sale in order for the Subcontractors to state quantum meruit claims against the defendants." Brief for Petitioners at 16. The plaintiffs point out that they seek *in personam* money judgments against the defendants and not an *in rem* remedy. Plaintiffs also recognize that a subcontractor's claim based on unjust enrichment would not lie against an owner who has paid the general contractor. *Id.* at 18. Under those circumstances the owner has received nothing for which it did not pay, and it would be inequitable to require the owner to pay twice.

This Court so held in *Hamilton & Spiegel, Inc. v. Board of Educ.*, 233 Md. 196, 195 A.2d 710 (1963). There, an unpaid subcontractor on a school construction project sued a board of education asserting that it was a third party beneficiary of the board-general contractor contract and that the board was unjustly enriched. *Id.* at 198, 195 A.2d at 711. We affirmed the dismissal on demurrer of both theories. As to the latter theory we explained that there was no allegation that the board had not paid the entire agreed contract price. *Id.* at 201, 195 A.2d at 712. Further, both the plaintiff and the board knew that, if the services and materials were not paid for, the Little Miller Act "payment bond was there, if properly availed of, for [the plaintiff's] protection." *Id.*, 195 A.2d at

712.[3] Plaintiffs' point is that Ammendale LP did not pay MHR in full, and, under those circumstances, it is unjust for Ammendale LP and its successors or alter egos in title to retain the benefits without having paid their value.

■ Plaintiffs invoke the law of restitution. Its substantive basis "is related to substantive equity," although "[r]estitution claims for money are usually claims 'at law.'" 1 D. Dobbs, *Law of Remedies* § 4.1(1), at 556 (2d ed. 1993) (hereinafter, Dobbs).[4] Much the same theory for relief as is advanced by the plaintiffs in the instant matter was submitted, without

---

**3.** For other cases recognizing that the owner who has fully paid the contractor is not unjustly enriched, see *Columbia Group, Inc. v. Homeowners Ass'n of Finisterra, Inc.,* 151 Ariz. 299, 727 P.2d 352, 355 (1986); *Guldberg v. Greenfield,* 259 Iowa 873, 146 N.W.2d 298, 305 (1966); *Lundstrom Constr. Co. v. Dygert,* 254 Minn. 224, 94 N.W.2d 527, 533 (1959); *Green Quarries, Inc. v. Raasch,* 676 S.W.2d 261, 266 (Mo.App. 1984); *Crockett v. Brady,* 455 S.W.2d 807, 808, 810 (Tex.Civ.App.1970); *Crockett v. Sampson,* 439 S.W.2d 355, 358 (Tex.Civ.App.1969).

**4.** Professor Dobbs has performed a great service by presenting some basic points about the terminology of restitution. He writes:

"(1) As we have seen, *restitution* is not *damages;* restitution is a restoration required to prevent unjust enrichment.

"(2) Restitution can be addressed by reference to the old forms of action in which restitutionary aims were pursued in the law courts. A judge can say that the plaintiff is entitled to recover in *assumpsit* as a reference to a form of action no longer in existence but one that might once have been used for restitutionary recoveries. Special forms of assumpsit can also refer to restitution, the most familiar of these being *quantum meruit.* These and parallel terms refer to one form of restitution or one process of getting it. They are not something different from restitution.

"(3) Restitution can also be addressed by reference to an older *theory* of relief (as distinct from the older forms of action). The older ways of speaking about restitutionary claims in law courts was to say that the law implied a contract between the parties although no contract existed. This in turn was called quasi-contract. So a judge who says the plaintiff has an implied in law contract claim could also say that the plaintiff has a quasi-contract claim or that the plaintiff has a restitution claim (for money).

"(4) Restitution can also be addressed by reference to the theory and form of the remedy used in equity. The terms constructive trust, equitable lien, accounting for profits and subrogation are terms that come to us from the equity side of the court. They reflect different measures or forms of restitution but they are all restitutionary."

1 Dobbs § 4.1(1), at 557 (footnotes omitted).

success, in *Goldberg v. Ford*, 188 Md. 658, 53 A.2d 665 (1947). The owner of land containing coal deposits leased the land to a lessee, together with the right to strip mine upon payment of a royalty. *Id.* at 660, 53 A.2d at 665. The lessee, in turn, contracted with the plaintiffs to mine the coal and load the coal onto trucks to be furnished by the lessee. *Id.* at 661, 53 A.2d at 666. After the plaintiffs had uncovered about 8,000 tons of coal and had incurred expenses of $18,000, the lessee defaulted in furnishing trucks and in paying royalties to the owner. *Id.* at 661, 663, 53 A.2d at 666–67. The plaintiffs then sued the owner, claiming "a right to restitution, upon the theory of unjust enrichment, enforcible by way of an equitable lien upon the property," in order to reimburse the plaintiffs "for the labor and improvements laid out by them upon the lessor's land." *Id.* at 662, 53 A.2d at 667. This Court said that the "lessor had an unqualified right under its lease agreement to re-enter and take possession of the coal that remained unsevered from the realty." *Id.* at 663, 53 A.2d at 667. The plaintiff knew of the lease provisions. *Id.* There was no mistake, no confusion as to title to the realty, and no charge of fraud. *Id.* The plaintiff had only a contract with the lessee. We said that

> "[i]n the somewhat analogous situation, where labor and material [are] furnished by a sub-contractor for improvements to property, it is only by virtue of [the mechanics' lien statute] that a remedy is available. If recovery could be had in Equity in such a case, there would have been no need for such legislation."

*Id.* at 663–64, 53 A.2d at 667 (citation omitted). *See also Freeform Pools, Inc. v. Strawbridge Home for Boys, Inc.*, 228 Md. 297, 303, 179 A.2d 683, 686 (1962).

 Prior to its decision in the instant matter, the Court of Special Appeals was presented with somewhat analogous claims for restitution in two cases, *Kline v. Signet Bank/Maryland*, 102 Md.App. 727, 651 A.2d 442, *cert. denied*, 338 Md. 201, 657 A.2d 795 (1995) and *Francis O. Day Co. v. Montgomery County*, 102 Md.App. 514, 650 A.2d 303 (1994). In *Day* a contractor had built streets in a development pursuant to a

contract with the developer, but the contractor had not been paid by the developer. *Id.* at 516, 650 A.2d at 304. The contractor then unsuccessfully sued Montgomery County, alleging unjust enrichment because the improvements were to be dedicated to the county. *Id.* at 516–17, 650 A.2d at 304. In *Kline* an unpaid subcontractor, alleging unjust enrichment, sued the construction lender who had foreclosed and acquired the property at the foreclosure sale through a subsidiary. *Kline,* 102 Md.App. at 730, 651 A.2d at 443. Both *Kline* and *Day* found persuasive the analysis in *D.A. Hill Co. v. Cleve-Trust Realty Investors,* 524 Pa. 425, 573 A.2d 1005 (1990), where the court recognized that a "third party is not *unjustly* enriched when it receives a benefit from a contract between two other parties where the party benefitted has not requested the benefit or misled the other parties." *Id.* at 434, 573 A.2d at 1010 (emphasis in original). The quoted language is a sufficiently correct statement of the law to be ordinarily applicable to the problem of whether restitution lies where benefits are conferred on a stranger to a contract by the performance rendered by one party to that contract.

One commentator on the subcontractor cases has observed that, although "there is no good reason why a default by one promisor ... should deprive the owner, who has fully performed, of the price ceiling fixed in his contract[, a] more plausible argument for recovery by the sub could be advanced where the owner still owes something on the prime contract." J. Dawson, *The Self–Serving Intermeddler,* 87 Harv.L.Rev. 1409, 1447 (1974) (Dawson). Dawson suggests that the owner "could be protected against double liability, it seems, by crediting any enforced payment to the sub on the owner's debt to the general." *Id.* Nevertheless, Dawson recognizes that "[t]he decisions, old and new, are lined up in an unbroken phalanx against restitution recovery by sub against owner in the triangular arrangement so far discussed, where the sub's performance is defined by and forms part of the performance promised by general to owner." *Id.*

The reported decisions involving claims by unpaid subcontractors against owners based on unjust enrichment do indeed

almost uniformly deny relief, and, contrary to the submission of the plaintiffs in the instant matter, these cases do not turn on whether the owner has fully paid the general contractor. *See, e.g., Stratton v. Inspiration Consol. Copper Co.,* 140 Ariz. 528, 683 P.2d 327 (1984); *G & B Contractors, Inc. v. Coronet Developers, Inc.,* 134 Ga.App. 916, 216 S.E.2d 705 (1975); *Bishop v. Flood,* 133 Ga.App. 804, 212 S.E.2d 443 (1975); *Dale's Serv. Co. v. Jones,* 96 Idaho 662, 534 P.2d 1102 (1975); *Indianapolis Raceway Park, Inc. v. Curtiss,* 179 Ind.App. 557, 386 N.E.2d 724 (1979); *Pendleton v. Sard,* 297 A.2d 889 (Me.1972); *Christle v. Marberg,* 421 N.W.2d 748 (Minn.Ct. App.1988); *Skjod v. Hofstede,* 402 N.W.2d 839 (Minn.Ct.App. 1987); *Haggard Drilling, Inc. v. Greene,* 195 Neb. 136, 236 N.W.2d 841 (1975); *Insulation Contracting & Supply v. Kravco, Inc.,* 209 N.J.Super. 367, 507 A.2d 754 (1986); *Graystone Materials Inc. v. Pyramid Champlain Co.,* 198 A.D.2d 740, 604 N.Y.S.2d 295 (1993); *Schuler–Haas Elec. Corp. v. Wager Constr. Corp.,* 57 A.D.2d 707, 395 N.Y.S.2d 272 (1977); *Paramore v. Rose,* 90 Or.App. 569, 752 P.2d 1291 (1988); *R & B Elec. Co. v. Amco Constr. Co.,* 471 A.2d 1351 (R.I.1984); *Berger Eng'g Co. v. Village Casuals, Inc.,* 576 S.W.2d 649 (Tex.Civ.App.1978); *Farwest Steel Corp. v. Mainline Metal Works, Inc.,* 48 Wash.App. 719, 741 P.2d 58 (1987) (a materials supplier to subcontractor versus general contractor); *Hopkins v. Anderson,* 7 Wash.App. 762, 502 P.2d 473 (1972); *Gebhardt Bros. v. Brimmel,* 31 Wis.2d 581, 143 N.W.2d 479 (1966). *But see Paschall's, Inc. v. Dozier,* 219 Tenn. 45, 407 S.W.2d 150 (1966).

Dawson observes that "[w]here reasons are stated in these cases they usually consist of no more than a conclusion: the owner's enrichment is not unjust." Dawson at 1446. He also notes that, at times, the rationale advanced is that it is "objectionable for the subcontractor to attempt to shift the risks he assumed in extending credit to the general." *Id.*

II G. Palmer, *The Law of Restitution* § 10.7(b), at 107 (1978, 1995 Cum.Supp. No. 2), states that "[m]odern cases continue to hold against aggrieved subcontractors on the theory that the services performed by the subcontractors are

for the benefit of the general contractors responsible for the completion of the improvement, not for the benefit of the owner." *Id.*

The theoretical underpinning of the rule denying *quantum meruit* recovery to an unpaid subcontractor against an owner, even where the owner has not fully paid the general contractor, is perhaps best stated by Professor Dobbs. He says:

"Statutes aside, the cases deny recovery. Somewhat similar cases, those in which improvements are ordered by a tenant or someone who is not the owner, also deny recovery to the hapless contractor. The subcontractor cases sometimes say that the landowner is not unjustly enriched and this seems accurate, because the landowner got no more than what he contracted for. He remains liable for the payments due the contractor if he has not already paid. Indeed, this liability redounds to the benefit of the sub, who can, using garnishment or subrogation, enforce his claim against the general contractor against any funds retained by the landowner. In addition, the parties almost certainly contemplated that their contractual arrangements constituted the full set of liabilities. The subcontractor relied on the credit of the general contractor, not the owner, and it is not unfair to him or enriching to the landowner to respect the contractual arrangement."

1 Dobbs § 4.9(4), at 698 (footnotes omitted); *see also* 3 Dobbs § 12.20(3), at 472–73.

For the foregoing reasons the unjust enrichment counts of the plaintiff's third amended complaint (Counts II, III, IV, VI and VIII) were properly dismissed, as the Court of Special Appeals held.

## II

In this part II we consider the legal sufficiency of the allegations of Count I. In doing so, we assume that plaintiffs' effort to set aside the foreclosure sale is not mooted by our holding in part I that unjust enrichment does not lie for reasons that are independent of whether Banbury LP paid fair

value as the substituted purchaser at foreclosure. Phrased another way, we assume that Bennett and D & L intend to press any interests in the Property that they might have as mechanics' lienholders, independently of their restitution theory for recovery.[5]

We also assume, without deciding, that Bennett and D & L are not precluded from attempting to vacate the judgment of ratification, despite their not having excepted to the report of sale and despite their not asserting any lack of notice. Compare *Bachrach v. Washington United Coop., Inc.*, 181 Md. 315, 29 A.2d 822 (1943); *Harris v. Hooper*, 50 Md. 537 (1879).

Further, we construe the allegations of Count I concerning collusion to involve at least five parties. The allegations describe negotiations and an agreement between the Bank on the one hand and representatives of Ammendale LP, of its corporate general partner, and of a new owner of the Property, either formed, or to be formed, as a limited partnership with a corporate, general partner. Although the plaintiffs allege that the same persons were investors in the old and new owner-developer entities, the plaintiffs allege no facts that would justify disregarding the separate entities. Indeed, the plaintiffs do not request that relief.

### A

The principal allegations of Count I are that the defendants agreed that the Bank would foreclose on the Property, that the Bank would buy in at a price agreed upon among the defendants, and that the Bank would substitute Banbury LP as the purchaser. It is further alleged that the purpose of utilizing a mortgage foreclosure to transfer ownership of the Property from Ammendale LP to Banbury LP was to extinguish the mechanics' liens, or potential liens, of the plaintiffs.

---

**5.** Because a lawfully conducted public sale theoretically produces the value of the property, any enhancement of value resulting from the unpaid work should be reflected in the sales price. In this way, plaintiffs' protection lies in their right to lien the Property and participate in any surplus available to junior lienors.

Plaintiffs' embellishment of their allegations with the charge of "collusion between the mortgagor and the mortgagee" adds nothing to the allegation of a purpose to "cut off the mechanics' lien rights of MHR and plaintiffs." "This Court has consistently held that ' "conspiracy" is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff.' " *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 189, 665 A.2d 1038, 1045 (1995) (quoting *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 645 n. 8, 650 A.2d 260, 265 n. 8 (1994)); *see also Domchick v. Greenbelt Consumer Servs., Inc.*, 200 Md. 36, 42, 87 A.2d 831, 834 (1952).

■ A secured party may buy in at the foreclosure sale. See Md.Code (1974, 1996 Repl.Vol.), § 7–105(e) of the Real Property Article (RP). The decisions of this Court rejecting exceptions to ratification based on purchase by the mortgagee at foreclosure have recently been collected and reviewed by Judge Motz, then of the Court of Special Appeals, in *Hurlock Food Processors Investment Assocs. v. Mercantile–Safe Deposit & Trust Co.*, 98 Md.App. 314, 327–32, 633 A.2d 438, 444–47 (1993).

■ Alleging an agreement among the defendants to have the Bank foreclose so that mechanics' liens will be wiped out is not a sufficient allegation, without more, to justify setting aside a mortgage foreclosure sale. If the sale is a lawful public sale, the fact that it has the intended consequence of wiping out junior liens is legally insufficient to prevent ratification. One of the lawful consequences of a mortgage foreclosure is that junior mechanics' liens are extinguished. See RP § 9–108 ("If . . . land or buildings against which a mechanic's lien has been established . . . shall be sold under foreclosure or a judgment . . . all liens and encumbrances on such property shall be satisfied in accordance with their priority. . . ."); *IA Constr. Corp. v. Carney*, 341 Md. 703, 672 A.2d 650 (1996).

In *Southern Maryland Oil, Inc. v. Kaminetz,* 260 Md. 443, 272 A.2d 641 (1971), one Millison owned land adjoining the site of a leased gasoline service station, and Millison acquired the landlord's interest in the service station site, subject to a mortgage which antedated the lease. There was an ongoing dispute between the lessee and Millison concerning the lessee's rights to take water from the adjoining property. Millison defaulted on the mortgage. *Id.* at 447, 272 A.2d at 643. The mortgagee's assignee foreclosed and bought in at the sale. *Id.* at 447–48, 272 A.2d at 643–44. The lessee excepted, asserting that Millison defaulted " 'to conspire, encourage or acquiesce in the foreclosure . . . only in an effort to destroy the leasehold interest[.]' " *Id.* at 447, 272 A.2d at 643–44. This Court affirmed ratification of the sale, stating that "[i]t is well established, however, in this State that the motives of a mortgagee or of his assigns in acquiring and in foreclosing a mortgage cannot be set up as a defense to a foreclosure of the mortgage." *Id.* at 453, 272 A.2d at 646. It was necessary for the tenant to "allege in its exceptions some impropriety in the conduct of the foreclosure sale or fraud by the mortgagor known to the purchaser which would render the sale invalid . . . ." *Id.,* 272 A.2d at 647.

*Southern Maryland Oil,* in turn, relied on *Bachrach,* 181 Md. 315, 29 A.2d 822. In that case three men, including the defendant's brother, had purchased property to be operated by the plaintiff as a summer camp for youths. *Id.* at 317, 29 A.2d at 824. A protracted dispute between the defendant's brother and the other joint tenants, involving their contributions to the project, remained unresolved when the defendant's brother died and his joint interest passed to the surviving owners. *Id.* The defendant then acquired mortgages, to which the property was subject and which were in default, and foreclosed. *Id.* The corporation brought the reported case in order to set aside the foreclosure sale on the ground of fraud. *Id.* at 318, 29 A.2d at 824. This Court reversed a decree setting aside the sale and directed that the complaint be dismissed. *Id.* at 325, 29 A.2d at 827. Relevant to the

allegations of the plaintiffs in the instant matter is the following passage from the opinion in *Bachrach:*

"Finally, the fact that the appellant and his attorney combined in the scheme to obtain the camp property by purchasing and foreclosing the mortgage does not amount to a conspiracy. A fraudulent conspiracy is the confederation of two or more persons to cheat and defraud, when the design has actually been executed by the confederates with resulting damage to their victim. As the mortgage in the present case was in default, the sale of the property to the appellant was lawful. It is expressly provided by the Mortgage Act that no title derived through the foreclosure of mortgaged property shall be impeached, either at law or in equity, on the ground that the property was bought in by the mortgagee or his assignee. Code, 1939, Art. 66, Sec. 15. If the acts of the mortgagee and the assignee were lawful, their confederation does not make their acts unlawful. To establish a conspiracy, it must be shown that there was a confederation of two or more persons for the performance of an unlawful act or a lawful act by unlawful means, and that damage resulted therefrom."

181 Md. at 324–25, 29 A.2d at 827 (citation omitted).

■ Our cases have said that "when a mortgagee purchases at [that mortgagee's foreclosure] sale the courts will pay special attention to see that [the mortgagee] has acted in good faith." *Habib v. Mitchell,* 257 Md. 29, 35, 261 A.2d 744, 747 (1970). That rule, however, "does not require [the mortgagee] to act inimically to [the mortgagee's] own interests." *Id.* The allegations of the instant third amended complaint, and the inferences therefrom, are that Ammendale LP was in default on its mortgage, that the Bank had no recourse other than against the Property, that the investors in Ammendale LP were willing to put up, or were able to obtain, some additional capital, and that the Bank was willing to make a new loan to Banbury LP. But the allegations also make clear that no party was so altruistic as to put additional funds into the arrangement in order to pay mechanics' lienors whose claims would be wiped out in foreclosure.

Basically, the complaint describes one form of a workout agreement.

"[T]he friendly foreclosure offers the obvious advantage of allowing the lender to rid the property of the burdens of any liens or encumbrances subordinate to the lien of the lender's mortgage or deed of trust. Moreover, the mere availability of foreclosure remedies gives the senior lender a potent threat to use in negotiating with junior lienholders in a deed in lieu, a friendly foreclosure, or a prepackaged bankruptcy."

N. Appleby, *Counseling the Lender on Friendly Foreclosures and Deeds in Lieu,* 10 Prac.Real Est.Law., Mar. 1994, at 21, 33. In the companion article, D. Prince, *Counseling the Borrower on Friendly Foreclosures and Deeds in Lieu,* 10 Prac.Real Est.Law., Mar. 1994, at 37, the author states:

"In states where foreclosure is relatively quick ... an uncontested foreclosure is frequently used as an alternative to a deed in lieu. The borrower agrees not to contest the foreclosure or file bankruptcy in return for ... other concessions. A 'friendly foreclosure' effectively eliminates the junior lien problem...."

*Id.* at 49.

S. Sklar, *Special Problems in the Construction Loan Workout,* a chapter in the American College of Real Estate Lawyers, *Real Estate Loan Workouts,* 115 (1991), advises that "[a] consensual workout may be an agreement under which the lender and borrower cooperate to modify or restructure the construction loan, or in a non-adversarial manner complete a judicial foreclosure...." *Id.* at 143.

Count I does not state a claim by alleging that an intended consequence of the defendants' agreement was the extinguishment of junior liens.

## B

The Court of Special Appeals concluded that Count I stated a claim upon which relief could be granted by reading into the complaint an allegation that is not found expressly

therein and by applying to the instant matter the holding in *Catabene v. Wallner,* 16 N.J.Super. 597, 85 A.2d 300 (1951). We do not agree with either aspect of that analysis.

Factually, the Court of Special Appeals inferred that the plaintiffs alleged that "Ammendale LP and [the Bank] agreed that Ammendale LP would intentionally default on its loan, even though the partnership was solvent and could make the required payments." *Bennett,* 103 Md.App. at 761, 654 A.2d at 955. The only possible source that we find in the third amended complaint for the previously quoted embellishment lies in the plaintiffs' conclusory characterization of the foreclosure sale as a "sham." This Court has said that "[g]eneral or conclusory allegations of fraud are insufficient. A plaintiff must allege facts which indicate fraud or from which fraud is necessarily implied." *Antigua Condominium Ass'n v. Melba Investors Atlantic, Inc.,* 307 Md. 700, 735, 517 A.2d 75, 93 (1986); *see also Wooddy v. Wooddy,* 256 Md. 440, 451, 261 A.2d 486, 491 (1970) ("It is well settled that in alleging fraud 'particular facts must be stated . . . .' "). In *Bachrach,* 181 Md. 315, 29 A.2d 822, dealing with a collateral attack, based on fraud, against an enrolled judgment of ratification, we said that "[a]s the particular acts of fraud relied on must be specifically charged, a bill of complaint making only general allegations of fraud is demurrable." *Id.* at 318, 29 A.2d at 824.

In the instant matter the plaintiffs' characterization, "sham," applies to the foreclosure *sale,* not to the existence of a default that authorized foreclosure under the mortgage. The "sham" allegation should be interpreted consistently with the other allegations of the third amended complaint to characterize the workout agreement as one under which the Bank would foreclose, bid to an upset price, and, if successful, substitute Banbury LP to which the Bank would make a new loan.

Further, "[t]he law presumes that the mortgagee or assignee has discharged his duty faithfully in the exercise of the power of sale in a mortgage." *Bachrach,* 181 Md. at 320, 29 A.2d at 825. Here, the record on which the ratification

judgment was based reflects that a senior vice president of the Bank's corporate predecessor executed the affidavit of indebtedness due. That debt totaled $23,592,806.07, including late charges. The plaintiffs do not expressly allege that the loan to Ammendale LP was not in default, and courts should not casually infer an allegation that the affidavit of indebtedness is false, based only on the characterization of the foreclosure sale as a "sham."

Reading the third amended complaint in accordance with the rules of pleading fraud, set forth above, renders the holding in *Catabene, supra,* irrelevant. *Catabene* is a fraudulent transfer case. The complaint alleged that a corporation's officers and stockholders caused the corporation to execute a mortgage as security for a non-existent corporate debt. The whole object of the scheme was to utilize the mortgage foreclosure, following a purported default, to transfer assets from the financially distressed corporation for no consideration. *Catabene,* 85 A.2d at 301–02. The plaintiff who was permitted to proceed with the collateral attack on the foreclosure sale ratification in *Catabene* was the trustee in bankruptcy of the corporation. *Id.* at 302. The plaintiffs in the instant matter do not assert that there was no loan from the Bank to Ammendale LP, or no default. The instant complaint does not state a legally sufficient claim of transfer in fraud of creditors' rights.

## C

Count I does allege an agreement between the Bank and Banbury LP under which the latter would not be a bidder at the foreclosure sale inasmuch as the Bank would bid and, if successful, substitute Banbury LP as the purchaser. The concern of the law is whether a combination "was formed for the fraudulent purpose of suppressing bidding at the sale." *Berg v. Plitt,* 178 Md. 155, 167, 12 A.2d 609, 614, *reh'g denied,* 178 Md. 155, 13 A.2d 364 (1940).

*Berg* involved, in part, whether an agreement among twenty-four scrap metal dealers to pool resources and bid

through an agent at a bankruptcy sale in Pennsylvania was void as contrary to public policy. On that aspect of the case this Court in *Berg* adopted the analysis of the Court in *Kearney v. Taylor,* 15 How. 494, 14 L.Ed. 787 (1854), by quoting the following:

> " 'It is true that in every association formed to bid at the sale, and who appoint one of their number to bid in behalf of the company, there is an agreement, express or implied, that no other member will participate in the bidding; and hence, in one sense, it may be said to have the effect to prevent competition. But it by no means necessarily follows that if the association had not been formed, and each member left to bid on his own account, that the competition at the sale would be as strong and efficient as it would by reason of the joint bid for the benefit and upon the responsibility of all. The property at stake might be beyond the means of the individual, or might absorb more than he would desire to invest in the article, or be of a description that a mere capitalist, without practical men as associates, would not wish to encumber himself with. * * * These observations are sufficient to show that the doctrine which would prohibit associations of individuals to bid at the legal public sales of property, as preventing competition, however specious in theory, is too narrow and limited for the practical business of life, and would oftentimes lead inevitably to the evil consequences it was intended to avoid. Instead of encouraging competition, it would destroy it. And sales, in many instances, could be effected only after a sacrifice of the value, until reduced within the reach of the means of the individual bidders. We must, therefore, look beyond the mere fact of an association of persons formed for the purpose of bidding at this sale, as it may be not only unobjectionable, but oftentimes meritorious, if not necessary, and examine into the object and purposes of it; and if, upon such examination, it is found, that the object and purpose are, not to prevent competition, but to enable, or as an inducement to the persons composing it, to participate in the biddings, the sale should be upheld—otherwise if for the

purpose of shutting out competition and depressing the sale, so as to obtain the property at a sacrifice.' "

178 Md. at 167–68, 12 A.2d at 614–15 (quoting 15 How. at 520–21, 14 L.Ed. at 797–98). *See also* Annot., *Enforceability as Between the Parties of Agreement to Purchase Property at Judicial or Tax Sale for Their Joint Benefit*, 14 A.L.R.2d 1267, 1269 (1950).

The above-quoted analysis is applied to mortgage foreclosures and permits certain agreements between the foreclosing mortgagee and potential bidders. For example, in *Polish Nat'l Alliance of Brooklyn v. White Eagle Hall Co.*, 98 A.D.2d 400, 470 N.Y.S.2d 642 (1983), involving a mortgage foreclosure sale, the court said:

"[W]e have come to recognize that such an agreement [*i.e.*, not to bid at judicial sales] may be valid if made for an honest purpose such as protecting an existing interest in property or to enable individuals to bid as a group when they would have been unable to do so individually. While such an agreement may incidentally diminish competition, its lawful purposes override its negative effects."

*Id.* at 410, 470 N.Y.S.2d at 650 (citations omitted). The court further stated:

"On the other hand, if neither party to the agreement has any existing interest in the property, it is unlawful for a prospective bidder to give consideration to induce another person to refrain from bidding, for in that case money that might ordinarily have served to increase the bid price is diverted to a third party at the expense of the mortgagor."

*Id.* at 410–11, 470 N.Y.S.2d at 651 (citations omitted).

In *First Fed. Savings & Loan Ass'n v. Blake*, 465 So.2d 914 (La.App.1985), a husband and wife were co-mortgagors on the mortgage of the family home. The married couple separated, the mortgage went into default, and it was foreclosed. *Id.* at 916. An official of the mortgage lender testified that at the time of sale there was an understanding between the lender and the wife that she would bid in at the sale, and the lender would finance her purchase. *Id.* at 917. The husband sought

to nullify the sheriff's sale of the property, contending that the lender and his wife "were in bad faith and acted together to deprive [him] of his ownership interest in the home." *Id.* at 920. The court said that "[t]here is no evidence in the record" to support that charge. *Id.* Necessarily, in the court's view, the express evidence from the lender of the agreement with one of the borrowers had no legal significance under the facts of that case.

In the instant matter the allegations indicate that under the agreement Banbury LP contributed $2,375,000 toward its purchase and the Bank loaned $18,675,000. If the parties had acted separately, there is no indication that Banbury LP would have bid at all, or would have been created. Nor is there any allegation or indication that the Bank, acting separately, would have bid in excess of the indebtedness due under the mortgage to Ammendale LP.[6] Most important, there is no allegation in the third amended complaint that the agreement between the defendants deterred any third parties from bidding, or in any way prevented the possibility of the sale's producing a surplus over the Bank's lien. "Where the loss to the complaining party was not caused by any breach of legal or equitable duty, it is *damnum absque injuria.*" *Bachrach,* 181 Md. at 323, 29 A.2d at 826.

Count I does not state a legally sufficient claim for setting aside the enrolled judgment of ratification of sale.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS IN NO. 900 REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A MANDATE AFFIRMING THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IN THE MORTGAGE FORECLOSURE CASE.*

---

6. The Bank did not seek a deficiency against the mortgagor. In *Polish Nat'l Alliance,* 98 A.D.2d at 407, 470 N.Y.S.2d at 649, the court said that "where the successful bid for a sum less than the amount due is made by a mortgagee who seeks no deficiency judgment, the law deems the bid to be the equivalent of the mortgage balance plus the sale expenses."

*JUDGMENT OF THE COURT OF SPECIAL APPEALS IN NO. 899 AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A MANDATE AFFIRMING IN PART AND REVERSING IN PART THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, AND REMANDING APPEAL NO. 899 TO THAT COURT FOR FURTHER PROCEEDING ON COUNTS V AND VII ONLY.*

*COSTS IN THIS COURT AND NINETY PER CENT OF THE COSTS IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE PETITIONERS.*