726 A.2d 702

LUSKIN'S, INC.

v.

CONSUMER PROTECTION DIVISION.

No. 64, Sept. Term, 1998.

Court of Appeals of Maryland.

March 22, 1999.

336

Thomas M. Wood, IV (Cynthia L. Leppert, Neuberger, Quinn, Gielen, Rubin & Gibber, P.A., on brief), Baltimore, for Petitioner.

John Nethercut, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen.; Rebecca Bowman, Asst. Atty. Gen., on brief), Baltimore, for Respondent.

Brief of the Maryland Retailers Ass'n as Amicus Curiae in support of Petitioner. William C. MacLeod, Ann M. Plaza, Collier, Shannon, Rill & Scott, Washington, DC.

Argued before BELL, C.J., and RODOWSKY, CHASANOW, RAKER, WILNER, CATHELL, and RAYMOND G. THIEME, Jr. (specially assigned), JJ.

RODOWSKY, Judge.

Presented here is an enforcement action brought by the respondent, Consumer Protection Division (the Agency), un-

der the Maryland Consumer Protection Act (the Act), Maryland Code (1975, 1990 Repl. Vol., 1998 Cum. Supp.), §§ 13–101 through 13–501 of the Commercial Law Article (CL).[1] At the time of the violations of the Act alleged by the Agency, the petitioner, Luskin's, Inc. (Luskin's), was a retailer of electronic and household goods and services throughout Maryland, in Virginia, and perhaps elsewhere. In the summer of 1992, Luskin's advertised and conducted a conditional gift promotional program which the Agency found to be deceptive. Principal among the multiple issues raised by the parties are the standard for determining deceptive advertising, particularly advertising that something is "free" and the scope of relief that the Agency may order.

## I. The Promotion

Vacation Ventures, Inc. (VVI), a Florida corporation, markets vacation packages. It sells certificates for these packages to retailers who distribute them to consumers as part of sales promotions. The certificates allow consumers to start a process to obtain VVI's vacation packages, which are subject to various conditions and qualifications. After investigating the experiences that certain retailers in other areas of the United States had had with VVI, Luskin's purchased 14,600 VVI travel certificates for $78,180.

Luskin's advertised the promotion by newspaper ads and on television. Set forth below is the text of the newspaper ad. The reproduction is not to scale. In brackets behind a line of text is the measured height of the lettering in the actual newspaper ad.

---

**1.** Unless otherwise noted all statutory references are to the Act.

# FREE [2.5 cm.]
# Airfare [1.9 cm.]
# For Two [1.7 cm.]

## FREE* AIRFARE [1.2 cm.]
## FOR TWO... [.5 cm.]
## TO FLORIDA, THE BAHAMAS OR HAWAII [.6 cm.]

*Buy An Appliance, TV, Stereo, VCR, or any Purchase over
$200 And You'll Get A Big Gift For Two (Round Trip Airfares). [.4 cm.]

Buy Selected Items For $200 to $299. (Get Airfare For 2 To/From) FLORIDA
Buy Selected Items For $300 to $399. (Get Airfare For 2 To/From) BAHAMAS
Buy Selected Items For Over $400. (Get Airfare For 2 To/From) HAWAII
 TICKETS MUST BE USED WITHIN ONE YEAR ASK FOR DETAILS. [.4 cm]

*Vacations Premiums Offered Through Vacation Ventures, Inc. Which is not affiliated with
Luskin's. Minimum Hotel Stay Required. See Store For Details. Because of Participation
by National Companies, Prior Sales Do Not Qualify for Free Airfare Offer. Applicable
Taxes Apply. See Stores For Details. [.3 cm.]

Also set forth in the ad were pictures and descriptions of color televisions, air conditioners, camcorders, a dehumidifier, a cellular telephone, a display pager, a sound system, and computers. In the television advertisements of the promotion the audio portion stated the minimum purchases required for free airfare to the particular destinations, but only a written text, briefly appearing visually on the screen, advised "Minimum hotel stay required. See store for details."

The Agency found that

"[p]rior to making a purchase at Luskin's, the consumer knew from the advertisements that: (1) free airfare was contingent upon the purchase of the requisite dollar amount of goods; (2) the airfare was offered through VVI which is not affiliated with Luskin's; (3) applicable taxes applied; and (4) a minimum hotel stay was required."

The details of how the "free airfare" could be obtained were set forth in a threefold, color brochure, purchased by Luskin's from VVI. It described the vacation packages, identified the

hotels, stated the room rates, set forth a page of "terms and conditions," and included a reservation request form. As found by the Agency,

> "[t]he VVI brochure discloses that the consumer is required to pay the following costs: (1) a $15.00 per person non-refundable processing fee; (2) seven [for Florida] to twelve [for Hawaii] nights hotel accommodations at the non-discounted or 'rack' rate; (3) three meals at $25.00 per person on the 'Discovery Cruise' (if the Bahamas vacation were chosen); (4) airfare between islands at rates set by VVI (if the Hawaiian vacation were chosen); (5) air tax; (6) fuel surcharges; (7) airport departure tax; (8) hotel tax; (9) port and service charges; (10) U.S. Government cruise passenger user fee; (11) Bahamian departure tax; and (12) hotel service charge."

The brochure further advises that the consumer must state first, second, and third preferences for departure dates for the vacation destination selected, that VVI must have forty-five days notice in advance of the first choice departure date, and that the succeeding choices must each be fifteen days apart. No requested vacation date was guaranteed, and all dates were subject to availability. There were also dates when travel was not available at all, including major holidays.

The reservation request form portion of the VVI brochure was referred to by the parties as the travel certificate. Each certificate bore a separate, preprinted, inventory control number which presumably identified it as one of the certificates sold to Luskin's. It was necessary for Luskin's to countersign and date a certificate when it was delivered to a buyer. Buyers who were interested in pursuing the promotion furnished VVI identifying information, three choices of dates, and a "non-refundable processing fee of $15.00 per person." If VVI confirmed availability of one of the dates, the consumer had to make a down payment, or payment in full, to VVI within ten days, at the risk of additional costs or of loss of monies previously paid.

The record does not reflect the total number of travel certificates issued to customers of Luskin's out of the 14,600 certificates purchased by Luskin's from VVI. Only 128 travel certificates were completed and sent to VVI and, of these, only eleven certificates were actually used for one of the vacations described in the VVI brochure.

The Agency found that the brochure, with the included travel certificate, was not furnished by Luskin's to a buyer until delivery of the goods that had been purchased. The president of Luskin's testified that a sample of the brochure was available in each of the Luskin's stores for review by customers. Through the Agency's own advertising, it located four customer witnesses who testified at the hearing. None of them saw a sample of the VVI brochure on display at the stores where they made their purchases. Nor did the salespersons volunteer details to those customer witnesses and, when asked, generally did not explain the promotion beyond the information presented in the Luskin's advertisements. Luskin's, however, did prepare a computer printout that listed the principal requirements for utilizing the VVI vacation package. This printout was affixed to the sales ticket at the time of purchase.

Thus, it appears that all customers who made purchases from Luskin's in the minimum required amount as set forth in Luskin's advertisements received a brochure, including a valid travel certificate, whether those customers were aware of the promotion or not. No customer, however, received the brochure prior to consummating the required minimum purchase. Those customers who took delivery at the point of sale received the brochure at that time, and those customers who had Luskin's make delivery did not receive the certificate until that delivery was made.

## II. Procedural History

On July 27, 1992, the Agency notified Luskin's that the free airfare ad violated § 13–305 of the Act. Section 13–305(b) provides:

"A person may not notify any other person by any means, as part of an advertising scheme or plan, that the other person has won a prize, received an award, or has been selected or is eligible to receive anything of value if the other person is required to purchase goods or services, pay any money to participate in, or submit to a sales promotion effort."

The Agency ordered Luskin's to discontinue the promotion.

Luskin's disagreed that the ad violated the Act, but the Agency advised Luskin's that if it did not discontinue its current free airfare advertisements, the Agency would bring an enforcement action. Luskin's discontinued the ad and immediately began to work on a new ad. Luskin's then presented a proposed second ad to the Agency for its review and approval. The Agency advised Luskin's that the second ad also would violate § 13–305.

On September 11, 1992, Luskin's filed an action in the Circuit Court for Harford County, seeking a judgment declaring that the second proposed ad complied with the Act. On September 28, 1992, the Agency brought an administrative enforcement action, charging Luskin's, by having publicized the first ad, with violating the general deceptive trade practice prohibition in § 13–303 of the Act by engaging in the deceptive trade practices described in § 13–301(1), (3), and (9) of the Act. The action also reiterated the charge of violating § 13–305.

Under § 13–301(1), a "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers" is a deceptive trade practice. Similarly, a "[f]ailure to state a material fact if the failure deceives or tends to deceive" is a deceptive practice under § 13–301(3). Likewise, § 13–301(9) proscribes "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same

in connection with . . . [t]he promotion or sale of any consumer goods. . . ."

Luskin's obtained a favorable declaratory judgment from the circuit court as to the second, proposed ad, but that judgment was vacated by the Court of Special Appeals under the primary jurisdiction doctrine, and the action was dismissed. *Consumer Protection Div. v. Luskin's, Inc.*, 100 Md.App. 104, 115, 640 A.2d 217, 222 (1994). We affirmed. *Luskin's Inc. v. Consumer Protection Div.*, 338 Md. 188, 657 A.2d 788 (1995).

The enforcement action as to the published, first ad that is now before us was tried before an administrative law judge (ALJ), who concluded in May 1993 that Luskin's had committed all of the violations that had been charged. In ruling on exceptions the Agency made immaterial modifications to the ALJ's opinion and issued its decision and final order in September 1993, adopting the ALJ's proposed opinion, as modified. The Agency ordered the relief and the establishment of a claims administration procedure that are more fully described in Parts VIII and IX, *infra*.

Luskin's sought judicial review in the Circuit Court for Harford County. In December 1996, the circuit court reversed. That court determined that it owed no deference to the conclusions of the Agency inasmuch as the issues presented "common sense kinds of questions" and disagreed with the Agency's findings on all counts. The circuit court held that Luskin's had violated neither § 13–303 nor § 13–305, that there had been an accord and satisfaction between Luskin's and the Agency, and that the enforcement action was retaliatory and selective, and, thus, unconstitutional.

The Court of Special Appeals reversed. *Consumer Protection Div. v. Luskin's, Inc.*, 120 Md.App. 1, 706 A.2d 102 (1998). That court held that a court in a judicial review action did owe deference to the Agency's findings, that the Agency's final decision and order were based upon substantial evidence, and that the Agency correctly interpreted the law. Luskin's petitioned for a writ of certiorari, which we granted.

### III. The Issues

In its petition for certiorari Luskin's raised eight issues which we rephrase and consolidate as follows:

1. What is the standard to be applied by the Agency in determining whether a practice is deceptive and how is it to be applied here?

2. Does § 13–301(9) require an intent to misrepresent?

3. Does § 13–305 apply to the "free airfare" promotion by Luskin's?

4. Was the circuit court obliged to give deference to the Agency's determinations, particularly its determinations concerning the defenses of accord and satisfaction and of retaliatory enforcement?

5. Is the Agency's cease and desist order overly broad?

6. Does the Agency's restitution order exceed its powers?

### IV. The Standard

In answer to the issue concerning the proper standard to be applied by the Agency, the parties argue over whether an ad is adjudged deceptive by a reasonable person standard or by an "unsophisticated" person standard. The latter standard seemingly is equated by the Agency with acting unreasonably. Luskin's contends that the reasonable person standard is the one that has been applied by the Federal Trade Commission (FTC) for at least fifteen years and that, if that standard were properly applied in the instant matter, the free airfare advertisements would not be deceptive. The Agency contends, citing principally *Golt v. Phillips*, 308 Md. 1, 517 A.2d 328 (1986), that Maryland follows the "unsophisticated" consumer test under which the free airfare ads are clearly deceptive, and, alternatively, that the ads also would be deceptive if the reasonable person standard is applied. As we explain below, semantics accounts for a large part of the gulf between the positions of the parties.

The debate between the parties also embraces the degree of materiality of an allegedly deceptive advertisement. Contend-

ing that its position is supported by FTC law, Luskin's submits that, in order to establish a violation, the Agency must prove that consumers would not have purchased goods from Luskin's during the period of the free airfare promotion *but for* that promotion. We address materiality and reliance in Part IV.C, *infra.*

The ALJ-based, final decision of the Agency considered there to be two distinct standards for determining deception, but held that the free airfare advertisement was a deceptive practice under both. The final decision in part reads:

"The total impression left with the consumer by both the newspaper and television advertisements is that Luskin's was offering free airfare for two, conditioned upon the requisite dollar-amount purchase from the store. The disclaimer used in the advertisements does not dispel this impression and was not seen by any of the consumer witnesses. Even had it been seen, its terms reasonably could be expected to lead consumers to erroneous conclusions about the true terms of the offer.

"Luskin's actually provided consumers with a VVI brochure and a redeemable vacation certificate. Luskin's, in fact, never provided free airfare to the consumer. At the conclusion of the purchase, upon delivery of the goods, the consumer was given a VVI brochure that included a redeemable certificate. Redemption required the consumer to expend hundreds to thousands of dollars. While it is true, that the airfare was 'free' upon the payment of these funds and satisfaction of the terms and conditions imposed by VVI, that cannot be interpreted by a reasonable consumer as the provision of 'free airfare for two.'

"The consumer could reasonably have believed that airline tickets or vouchers would be provided by Luskin's. Luskin's chose bold typeface to notify the consumer in the advertisement that 'tickets must be used within one year ask for details.' In fact, no tickets were provided. Luskin's focused on free airfare and tickets rather than on the vacation certificate. By doing so, it led the reasonable consumer to believe that the airfare primarily was condi-

tioned upon the purchase of consumer goods at Luskin's and that any further condition or requirement would be secondary. However, the purchase of consumer goods is a secondary cost when compared with the cost of redeeming the travel certificate.

. . . .

"In sum, under the FTC statements of policy and cases construing the FTC Act, the standard for measuring the overall impression of an advertisement is the total impression left upon the reasonable consumer. It is notable that the Court of Appeals of Maryland still applies a stricter 'unsophisticated consumer' standard in construing the Maryland Consumer Protection Act. Neither standard measures the effect upon the most sophisticated, skeptical consumer. The ordinary consumer, whether 'reasonable' or 'unsophisticated', is not expected to scrutinize, analyze and research an advertisement[.]"

(Citations omitted).

Thus, we disagree with the Court of Special Appeals when it said:

"The Agency permissibly chose not to apply the more modern FTC standard on deception but instead applied the law as stated by the Court of Appeals in *Golt, i.e.,* by implicitly using a measure less stringent than the reasonable consumer standard, and by not adding a 'but for' materiality element."

*Luskin's,* 120 Md.App. at 32–33, 706 A.2d at 117.[2]

## A. The FTC Approach

Understanding the debate requires a review of the evolving approach by the FTC to determinations of what is deceptive. In its brief here the Agency has staked out a position under an approach utilized by the FTC in some cases prior to its decision in *Cliffdale Associates, Inc.,* 103 F.T.C. 110 (1984). To that decision the FTC appended a copy of a letter dated

---

**2.** We shall address materiality in Part IV.D, *infra.*

October 14, 1983, to the United States House of Representatives, describing the FTC's enforcement policy in deception cases (the FTC Policy).

Writing in 1964, one observer of FTC enforcement against false advertising described "the level of consumer intelligence" selected by the FTC "against which it will consider" an advertisement. I.M. Millstein, *The Federal Trade Commission and False Advertising,* 64 Colum. L.Rev. 439, 458 (1964) (Millstein). "It may be said," concluded Millstein, "that the FTC has selected an extremely low intelligence level, and that the courts have not significantly disturbed the [FTC's] determinations in this respect." *Id.*[3]

Illustrating Millstein's conclusion is *Gelb v. FTC,* 144 F.2d 580 (2d Cir.1944). There a divided panel sustained an order prohibiting the manufacturer of Clairol from representing that the product's effect on coloring hair was permanent. "There [was] no dispute that [Clairol] imparts a permanent coloration to the hair to which it is applied, but the [FTC] found that it has 'no effect upon new hair,' and hence concluded that the representation as to permanence was misleading." *Id.* at 582. Referring to *Gelb* as a "farfetched conclusion[ ]," a former director of the FTC's Bureau of Consumer Protection has observed that "[p]ast [FTCs] occasionally have carried to astonishing lengths their mandate to protect the credulous against deception." R. Pitofsky, *Beyond Nader: Consumer Protection and the Regulation of Advertising,* 90 Harv. L.Rev. 661, 676 n. 58 (1977). *See also Charles of the Ritz Distribs. Corp. v. FTC,* 143 F.2d 676, 679–80 (2d Cir.1944) (prohibiting use of the trademark "Rejuvenescence" for a foundation make-up cream because "the average woman ... might take 'rejuvenescence' to mean that this 'is one of the modern miracles' and is 'something which would actually cause her youth to be restored.' ") (quoting testimony of FTC's expert).

---

3. Millstein's thesis was that the FTC standard had been "selected without real consideration of the constitutional questions that may be involved." Millstein, *supra,* at 458. His point was "that the lower the intelligence level used, the greater the limitations on freedom of speech." *Id.* at 462.

The foregoing cases are not entirely representative of the pre–1984 body of false advertising law, even in the Second Circuit. In *FTC v. Sterling Drug, Inc.*, 317 F.2d 669 (2d Cir.1963), the court affirmed the refusal by a district court to issue an injunction enforcing an FTC order against the manufacturer of Bayer aspirin. Funded by an FTC grant, an independent medical team had conducted a comparative study of five proprietary analgesic compounds, including Bayer aspirin. The conclusions of the study were published in the Journal of the American Medical Association and were quite favorable to Bayer aspirin. Its advertisement in print media began by stating " 'GOVERNMENT-SUPPORTED MEDICAL TEAM COMPARES BAYER ASPIRIN AND FOUR OTHER POPULAR PAIN RELIEVERS.'—'FINDINGS REPORTED IN THE HIGHLY AUTHORITATIVE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION REVEAL. . . .' " *Id.* at 673. The FTC contended that these portions of the ad deceptively implied that Bayer aspirin was endorsed by the federal government and by the American Medical Association.

The *Sterling Drug* court restated certain well-established rules. "[A]dvertising falls within [the FTC Act's] proscription not only when there is proof of actual deception but also when the representations made have a capacity or tendency to deceive, i.e., when there is a likelihood or fair probability that the reader will be misled." *Id.* at 674. The court further said that

"the cardinal factor is the probable effect which the advertiser's handiwork will have upon the eye and mind of the reader. It is therefore necessary in these cases to consider the advertisement in its entirety and not to engage in disputatious dissection. The entire mosaic should be viewed rather than each tile separately."

*Id.*[4] With respect to a reader of the ad, the *Sterling Drug* court said that "[u]nlike that abiding faith which the law has in

---

4. In the instant matter the Agency calls this the total impression test, which it undertook to apply. Luskin's does not dispute the rule—only it's application.

the 'reasonable man,' it has very little faith indeed in the intellectual acuity of the 'ordinary purchaser' who is the object of the advertising campaign." *Id.*

Nevertheless, the court held that "our hypothetical, sub-intelligent, less-than-careful reader" would not be led to believe that the Government endorsed the product itself, as opposed to having supported the study. *Id.* at 675. The court further held:

> "To assert that the ordinary reader would conclude from the use of the word 'authoritative' that the study was endorsed by the Journal and the Association is to attribute to him not only a careless and imperceptive mind but also a propensity for unbounded flights of fancy. This we are not yet prepared to do."

*Id.* at 676.

The FTC decision in *Heinz W. Kirchner t/a Universe Co.,* 63 F.T.C. 1282 (1963), also forms part of the pre-FTC Policy history. The product involved there, "Swim–Ezy," was a flat, inflatable rubber bladder connected to a plastic tube. The Swim–Ezy was to be worn under a bathing suit or trunks and inflated after the wearer had entered the water, thus theoretically preventing others from realizing that the wearer could not swim. Advertising referred to the product as an "invisible" swim aid. On that aspect of the case the FTC found no violation, on the following rationale:

> "To be sure, 'Swim–Ezy' is not invisible or impalpable or dimensionless, and to anyone who so understood the representation, it would be false. It is not likely, however, that many prospective purchasers would take the representation thus in its literal sense. True, as has been reiterated many times, the [FTC's] responsibility is to prevent deception of the gullible and credulous, as well as the cautious and knowledgeable (see e.g., *Charles of the Ritz Dist. Corp. v. F.T.C.,* 143 F.2d 676 (2d Cir.1944)). This principle loses its validity, however, if it is applied uncritically or pushed to an absurd extreme. An advertiser cannot be charged with liability in respect of every conceivable misconception, how-

ever outlandish, to which his representations might be subject among the foolish or feebleminded. Some people, because of ignorance or incomprehension, may be misled by even a scrupulously honest claim. Perhaps a few misguided souls believe, for example, that all 'Danish pastry' is made in Denmark. Is it, therefore, an actionable deception to advertise 'Danish pastry' when it is made in this country? Of course not. A representation does not become 'false and deceptive' merely because it will be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed. If, however, advertising is aimed at a specially susceptible group of people (e.g., children), its truthfulness must be measured by the impact it will make on them, not others to whom it is not primarily directed."

*Id.* at 1289–90.

*Heinz W. Kirchner* was relied on in the FTC Policy. Appendix to *Cliffdale Assocs., Inc.,* 103 F.T.C. at 178. *Cliffdale Associates* involved a gasoline conservation, automobile-retrofit-device called the "Ball–Matic." *Id.* at 161. Advertising claims made for the Ball–Matic included that it would get " 'up to ... 100 extra miles between fillups.' " *Id.* at 167. The FTC upheld an ALJ's decision finding the claims deceptive because they were scientifically unsubstantiated. Significant to the case before us is that the FTC utilized *Cliffdale Associates* as the vehicle for applying the Policy to decide an actual case.

The FTC said:

"Consistent with its Policy Statement on Deception, issued on October 14, 1983, the [FTC] will find an act or practice deceptive if, first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material. These elements articulate the factors actually used in most earlier [FTC] cases identifying whether or not an act or practice was deceptive, even though the language used in those cases

was often couched in such terms as 'a tendency and capacity to deceive'.

"The requirement that an act or practice be 'likely to mislead', for example, reflects the long established principle that the [FTC] need not find *actual* deception to hold that a violation of Section 5 has occurred."

*Id.* at 164–65 (footnotes omitted). Further explaining the second element, the FTC said that "[v]irtually all representations, even those that are true, can be misunderstood by some consumers," *id.*, and that it had "long recognized that the law should not be applied in such a way as to find that honest representations are deceptive simply because they are misunderstood by a few." *Id.*

The standard for deception applied by the FTC in *Cliffdale Associates* and succeeding cases is the standard for determining deception now applied by the federal courts. *See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir.1994), *cert. denied*, 514 U.S. 1083, 115 S.Ct. 1794, 131 L.Ed.2d 722 (1995); *Kraft, Inc. v. FTC*, 970 F.2d 311, 324 (7th Cir.1992), *cert. denied*, 507 U.S. 909, 113 S.Ct. 1254, 122 L.Ed.2d 652 (1993); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir.1988); *Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1435–36 (9th Cir.), *cert. denied*, 479 U.S. 828, 107 S.Ct. 109, 93 L.Ed.2d 58 (1986); *FTC v. Wilcox*, 926 F.Supp. 1091, 1098 (S.D.Fla.1995); *FTC v. Patriot Alcohol Testers, Inc.*, 798 F.Supp. 851, 855 (D.Mass.1992).

## B. Section 13–105

The parties are also at odds over the effect on the instant matter of § 13–105. In part it provides:

"It is the intent of the General Assembly that in construing the term 'unfair or deceptive trade practices', due consideration and weight be given to the interpretations of § 5(a)(1) of the [FTC] Act by the [FTC] and the federal courts."

The Court of Special Appeals concluded that "[t]he Agency is not required to apply federal law, only to give it due consideration and weight." *Luskin's,* 120 Md.App. at 32, 706 A.2d at

117. That court concluded that the Agency's discussion of the FTC standard satisfied the directive of § 13–105 and that the Agency permissively chose to apply pre-FTC Policy law. *Id.*

The origins of § 13–105 trace to Maryland's first Consumer Protection Act, enacted by Chapter 388 of the Acts of 1967 and codified in Maryland Code (1957, 1969 Repl.Vol.) as Article 83, §§ 19 through 27. Former Article 83, § 21 provided "that nothing herein contained shall apply to any *advertisement* which is subject to and complies with the rules and regulations of, and the statutes administered by the [FTC]." (Emphasis added). False advertising was also subject to a civil penalty, on action of the Attorney General, by Chapter 337 of the Acts of 1966, codified as Maryland Code (1957, 1967 Repl.Vol.), Article 27, § 195A.

In 1974 the Consumer Protection Act was considerably enlarged by Chapter 609 of the Acts of that year. For example, Chapter 609 added a list of the types of conduct, such as that now found in § 13–301, that constituted an unfair or deceptive trade practice. Chapter 609 repealed former Article 83, § 21 and enacted a new Article 83, § 20A which provided in relevant part that "[i]t is the intent of the General Assembly that in construing unlawful and deceptive *practices* as defined in this subheading due consideration and weight shall be given to the interpretation of the [FTC] and the federal courts relative to" the FTC Act. (Emphasis added).

Thus, under former Article 83, § 21, the Agency, in effect, would be required to apply federal law if the defense of compliance with the FTC Act were asserted to a false advertising claim. When the Maryland Act was expanded in 1974 the scope of the Act's reference to the FTC was expanded to apply to all allegedly deceptive acts and practices. Further, in lieu of possibly having the Agency interpret and apply the FTC Act in a matter of first impression, the General Assembly announced its intent that the Agency give "due consideration and weight" to actual interpretations by the FTC and by the federal courts.

With respect to the civil penalty provision for false advertising, former Article 27, § 195A is now CL § 11–706. It reads: "In any action brought under this subtitle, it is a defense that the advertisement ... is subject to and complies with the rules and regulations of and the statutes administered by the [FTC] or any unit of the State government." Both former Article 27, § 195A and former Article 83, § 20A were revised and re-enacted at the same time in the adoption of the Commercial Law Article by Chapter 49 of the Acts of 1975.

■ Against the foregoing background we hold, for a number of reasons, that the Agency did not comply with § 13–105 when, at least in the view of the Court of Special Appeals, it rejected the FTC Policy. The legislature's reference to FTC and federal court interpretations of the federal act contemplates a growing and developing body of law. That legislative intent is disregarded if the Agency essentially freezes the standard for determining a deceptive practice to FTC and federal court interpretations rendered prior to the FTC Policy.

One purpose underlying § 13–105 is to achieve a fair comparability between what the FTC and the Agency consider to be unfair or deceptive, absent some clear Maryland policy that dictates a different conclusion. Fair comparability seemingly is most important in the area of advertising. The General Assembly certainly was aware of the fact that Maryland merchants advertise interstate, particularly Maryland merchants in the metropolitan Washington, D.C. area. Maryland merchants who disseminate in the District of Columbia and Northern Virginia ads that are considered lawful by the FTC ordinarily should be permitted to publish the same ad in Maryland without violating the Act. Reinforcing this conclusion is CL § 11–706 which makes FTC compliance defensive in a penalty action for alleged false advertising.

More fundamental is the public policy purpose of not granting to the Agency an unbridled discretion to determine what is "unfair" or "deceptive." The legislative intent is demonstrated by the prohibited practices enumerated in subsections of

§ 13–301, some of which are quite specific. The subsections of § 13–301, however, cannot exhaust the ingenuity of those disposed to deceive or unfairly to treat consumers. Hence the necessity for the general subsections, (1), (3), and (9), that are charged here. When charges by the Agency range beyond the more specific of the § 13–301 violations, the obvious place to look for precedent is the body of law developed under § 5 of the FTC Act. It is one way in which to test if the Agency has exceeded its delegated discretion. Thus, § 13–105's expression of intent to give "due consideration and weight" to FTC law is more precatory than hortatory.

In *Haskell v. Time, Inc.*, 857 F.Supp. 1392 (E.D.Cal.1994), the federal district court for the Eastern District of California determined whether deceptive trade practices under the California Business Practices Act should be judged by an "unwary" consumer test or by a "reasonable" consumer test. Allegedly deceptive were statements made in soliciting magazine subscriptions through a promotion that included "sweepstakes" entries. *Id.* at 1399. The California statute was silent on the relevance of the law under the FTC Act. For a number of reasons the court applied the reasonable consumer test. It was the FTC standard, and the California statute was a "little" FTC Act. The court was further persuaded by the use of the reasonable person standard under the Lanham Act and in actions for securities fraud, deceit and misrepresentation, and common law unfair competition (citing a California state decision). *Id.* at 1398.[5]

The Agency urges that we reject the FTC Policy by reliance on *Golt v. Phillips*, 308 Md. 1, 517 A.2d 328. *Golt* was a private action brought under the Act by a tenant against the

---

**5.** For cases applying a state consumer protection statute that provides for giving FTC interpretations "great" weight and due consideration, see *Alaska v. O'Neill Investigations, Inc.*, 609 P.2d 520 (Alaska 1980) (relying on FTC law to conclude that the state consumer protection statute embraced deceptive debt collection practices); *Western Acceptance Corp. v. Jones, Att'y Gen.*, 117 Idaho 399, 788 P.2d 214 (1990) (same); *Celebrezze, Att'y Gen. v. United Research, Inc.*, 19 Ohio App.3d 49, 482 N.E.2d 1260 (1984) (same).

landlord of a property in Baltimore City. The tenant had responded to an ad to lease the property but had not been advised that the premises was not licensed as required by a Baltimore City multiple-family-dwelling ordinance. *Id.* at 9, 517 A.2d at 332. We held this to be a violation of the Act, concluding that lack of proper licensing was a material fact. *Id.* at 10, 517 A.2d at 332. The Agency here relies on a sentence from *Golt* reading: "An omission is considered material if a significant number of unsophisticated consumers would attach importance to the information in determining a choice of action." *Id.* We cited *Charles of the Ritz*, 143 F.2d at 679–80, and *Gulf Oil Corp. v. FTC*, 150 F.2d 106, 109 (5th Cir.1945), with a signal to compare those cases with Restatement (Second) of Torts § 538 (1977), adopting a reasonable person standard for materiality in common law deceit. We then held: "In our view, the lack of proper licensing for an apartment under most circumstances is a material fact that *any* tenant would find important in his determination of whether to sign a lease agreement and move into the premises." *Golt*, 308 Md. at 10, 517 A.2d at 332 (emphasis added).

Neither the FTC Policy nor the 1984 FTC decision in *Cliffdale Associates* was argued to this Court in *Golt*, and this Court was not asked to make a choice between competing standards. Nor did this Court make a choice. Inasmuch as "any" tenant would have been deceived, the holding in *Golt* happens to satisfy both standards.

More important is the premise underlying the opinions of the Agency and of the Court of Special Appeals to the effect that the "reasonable" consumer and the "unsophisticated" consumer are antithetical concepts. The logical conclusion from such a premise is that the standard for measuring a deceptive ad is its impression on an unreasonable consumer. That view is erroneous. A consumer may be both reasonable and unsophisticated. Sophistication relates to the consumer's expertise in a particular area, not to that person's reasonableness. In the case of alleged deceptive advertising, the product or service advertised and the target audience of the ad are of critical importance. For example, in *Golt* the target audience

for the advertisement was all persons seeking basic housing in an apartment in Baltimore City. A person who is inexperienced in the rental real estate market in Baltimore City and does not know of the licensing requirements or know where and how to obtain that information is not thereby unreasonable. Indeed, it would seem that even a sophisticated consumer who read the ad in *Golt* for an apartment in the multiple-family dwelling and who knew of the licensing requirement could reasonably rely on the landlord's having complied with that law.

Although not using the reasonable versus unsophisticated terminology, a good illustration of the difference between the unsophisticated, the reasonable, and the sophisticated is found in *Standard Oil Co. v. FTC*, 577 F.2d 653 (9th Cir.1978). The product advertised there was a gasoline additive called "F–310" that was marketed as an anti-pollutant. For example, one television ad utilized a clear balloon that was affixed to the tailpipe of an automobile and the engine started. In the "before" depiction, the balloon filled with dark gases while in the "after" depiction, the balloon inflated but was clear. An FTC examiner found that the ads accurately depicted the product's performance, but the FTC concluded that there were violations, two of which were that the commercials "falsely represented (1) that the use of F–310 would result in a complete reduction of air pollutants" and "(3) that the use of F–310 would affect all types of exhaust emissions[.]" *Id.* at 657.

With respect to the first claimed violation the Ninth Circuit stated that "neither the courts nor the [FTC] should freely speculate that the viewing public will place a patently absurd interpretation on an advertisement." *Id.* The court did "not think that any television viewer would have a level of credulity so primitive that he could expect to breath fresh air if he stuck his head into a bag inflated by exhaust, no matter how clean it looked." *Id.* In the terminology which we are using in the instant matter that consumer would be both unsophisticated and unreasonable, and the ad would not be deceptive.

The court in *Standard Oil,* however, sustained the other violation described above. The court noted evidence that only "fourteen percent of motorists [were] aware that most polluting elements in automobile exhaust are invisible." *Id.* at 657–58 (footnote omitted). These motorists would be deceived by the absence of black smoke and particulate matter in the "after" presentation. In the parlance that we are using in the instant matter, those consumers would be reasonable, but not sophisticated.

## C. Materiality

■ Luskin's contends that "giving due consideration and weight" to the FTC Policy requires that the materiality element of the determination of deception be based on "but for" causation. Luskin's bases this argument on a summary in the Policy of the materiality element, where the FTC said:

> "The basic question is whether the act or practice is likely to affect the consumer's conduct or decision with regard to a product or service. If so, the practice is material, and consumer injury is likely, because consumers are likely to have chosen differently *but for* the deception. In many instances, materiality, and hence injury, can be presumed from the nature of the practice. In other instances, evidence of materiality may be necessary."

*Cliffdale Assocs., Inc.,* 103 F.T.C. at 175–76 (emphasis added). Under the Policy, it is the probability that the deceptive practice affected the customer's decision that makes the misrepresentation material. At a minimum a practice is subject to a cease and desist order if it has the tendency to deceive. The balance of the summary, including "but for" causation, addresses the question of actual consumer injury.[6]

Our reading of the Policy statement is confirmed by the FTC's description of the requisites of materiality in *Cliffdale Associates.* There the FTC said that

---

6. In the matter before us, the relief is not to be based on compensation for consumer loss or injury. See Part IX, *infra.*

"a material misrepresentation ... involves information that is important to consumers and, hence, likely to affect their choice of ... a product. Consumers thus are likely to suffer injury from a material misrepresentation."

*Id.* at 165–66.

We hold that the Act includes the above description of the materiality element in a deceptive practice.

### D. FTC Guidelines on "Free"

In 1971, the FTC adopted a regulation interpretive of § 5 of the FTC Act. 36 Fed.Reg. 21,517 (1971). *See* 16 C.F.R. § 251.1 (1998), "Guide Concerning Use of the Word 'Free' and Similar Representations" (Free Guidelines). In relevant part the regulation provides:

"When making 'Free' or similar offers all the terms, conditions and obligations upon which receipt and retention of the 'Free' item are contingent should be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood. Stated differently, all of the terms, conditions and obligations should appear in close conjunction with the offer of 'Free' merchandise or service. For example, disclosure of the terms of the offer set forth in a footnote of an advertisement to which reference is made by an asterisk or other symbol placed next to the offer, is not regarded as making disclosure at the outset."

This interpretive rule reiterates the position taken by the FTC in 1953. *See In re Walter J. Black, Inc. t/a Classics Club & Detective Book Club,* 50 F.T.C. 225 (1953).[7]

The FTC has stated that

"[w]hile the guide is interpretive of laws administered by the [FTC] and thus advisory in nature, proceedings, as

---

7. The FTC has tentatively scheduled a review of this guideline on "free" for the year 2000. Comments will be invited. *See* Notice of Intent to Request Public Comments on Rules, 64 Fed.Reg. 3668 (1999) (to be codified at 16 C.F.R. ch. 1).

appropriate, to enforce the requirements of law *as explained* in the guide may be brought...."

36 Fed.Reg. at 21,517 (emphasis added). *See also* 16 C.F.R. § 1.5 (1998) ("Industry guides are administrative interpretations of laws administered by the [FTC] for the guidance of the public in conducting its affairs in conformity with legal requirements.").

According to the general provisions of the Free Guidelines, they were promulgated to accord with the way in which "the public understands" the word "free." The FTC noted that "[b]ecause the *purchasing public* continually searches for the best buy, and regards the offer of 'Free' merchandise or service to be a special bargain, all such offers must be made with extreme care so as to avoid any possibility that consumers will be misled or deceived." 16 C.F.R. § 251.1(a)(2) (emphasis added). As with the FTC Policy the Free Guidelines should be given due weight and consideration. *See generally* D. Pridgen, *Consumer Protection and the Law* § 11:21 (1986, 1998 Supp.) (Pridgen) ("Most rational consumers presumably realize there is no such thing as a free lunch. Until the FTC is willing forthrightly to wipe the slate clean, however, marketers should attempt to follow the full disclosure ... rule for free offers, as state enforcement authorities may continue to incorporate the doctrine through references to FTC law in the state unfair and deceptive trade practices statutes.").

The same commentator has suggested that "[d]espite the history of rigorous enforcement, at the present time ... the [Free Guidelines are] rarely ever applied by the [FTC]." Pridgen § 11:31. Most commentators, however, continue to recognize the Free Guidelines as the FTC's statement on lawful use of the word "free." National Consumer Law Center, *Unfair and Deceptive Acts and Practices* § 4.6.4 (4th ed.1997); T.T. Trai Le, *Protecting Consumer Rights* § 2.08 (1987); H. Alperin & R. Chase, *Consumer Law* § 77 (1986); G.E. Rosden, *The Law of Advertising* § 28.06[1] (1973, 1998 Supp.).

In 1988, The Reader's Digest Association, Inc. (Reader's Digest) claimed that the language of the Free Guidelines was a remnant of pre-*Cliffdale Associates* law. *In re Reader's Digest Ass'n,* 1988 FTC LEXIS 7 (1988). The challenge was raised in a request that the FTC reopen and modify a 1963 consent order. Section 1 of that order prohibited Reader's Digest from

"[u]sing the word 'free', 'absolutely free', 'paid in full gift' or any other word or words of similar import or meaning, to designate or describe articles of merchandise ... in advertising or other offers to the public when all the conditions, obligations, or other prerequisites to the receipt and retention of the said free .... articles of merchandise are not clearly and conspicuously explained or set forth at the outset so as to leave no *reasonable probability* that the terms of the advertisements or offer might be misunderstood."

*In re Reader's Digest Ass'n,* 63 F.T.C. 1653, 1660–61 (1963) (emphasis added).

The FTC rejected Reader's Digest's position, concluding that the company had "failed to demonstrate that changed conditions ... of law require deletion of the reasonable probability clause." *In re Reader's Digest Ass'n,* 111 F.T.C. 758, 760 (1989). The FTC said that it had used comparable language in other orders before and since the challenged 1963 order and that it "continues to use language virtually identical to the reasonable probability clause in its Free [Guidelines]. The continued use of the language in the Free [Guidelines] reflects the [FTC's] confidence in the propriety of the language of the reasonable probability clause." *Id.* at 761.

*In re Encyclopaedia Britannica, Inc.,* 111 F.T.C. 1 (1988), and *In re Grolier, Inc.,* 104 F.T.C. 639 (1984), were requests by those publishers that the FTC modify orders that, in relevant part, precluded the companies from advertising goods or services as "free" unless those offers complied "with all of the terms of the [FTC's] 'Guide Concerning Use of the Word "Free" and Similar Representations.'" The FTC retained

those portions of the orders that required compliance with the Free Guidelines. 111 F.T.C. at 14; 104 F.T.C. at 643.

Similarly, in 1994, the FTC barred the Beverly Hills Weight Loss Clinic from representing that any of its weight loss programs could be obtained for free, absent certain disclosures, including " '[y]ou must pay for [list of products or services that participants must purchase at additional cost] to take advantage of this free offer.' " *In re Beverly Hills Weight Loss Clinics Int'l, Inc.*, 118 F.T.C. 213, 255 (1994). *See also In re America Online, Inc.*, 5 Trade Reg. Rep. (CCH) ¶ 24,260 (Mar. 16, 1998) (failure to disclose the terms and conditions of a "free" offer constituted a deceptive practice). These requirements are remarkably similar to those of the Free Guidelines.[8]

---

**8.** Several states have directly incorporated the relevant aspects of the Free Guidelines into either their consumer protection statutes or their regulations. *See, e.g.*, 515 Ill. Comp. State 505/P2 (West 1992) ("It is an unlawful practice for any person to promote or advertise any business, product, or interest in property, by means of offering free prizes, gifts or gratuities to any consumer, unless all material terms and conditions relating to the offer are clearly and conspicuously disclosed at the outset of the offer so as to leave no reasonable probability that the offering might be misunderstood."); Conn. Agencies Regs. § 42–110b–19 (1998) ("It shall be an unfair or deceptive act or practice to: (a) Advertise any merchandise or service as free by the use of the word 'free' or any other terms of similar import when the merchandise or service is not, in fact free.... Failure to disclose any and all terms, conditions and obligations required of the consumer shall be a violation of these regulations."); Idaho Admin. Code § 04.02.01.071 (1998) ("It is an unfair and deceptive act or practice for a seller to offer any goods or services as free, by use of the word 'free' or other terms of similar import, if the seller fails to clearly and conspicuously disclose at the outset all terms, conditions and obligations upon which receipt and retention of the free items are contingent."); Ohio Admin. Code § 109:4–3–05(C) (1998) ("When using the word 'free' in a consumer transaction, all the terms, conditions, and obligations upon which receipt and retention of the 'free' goods or services are contingent shall be set forth clearly and conspicuously at the outset of the offer. Terms, conditions, and obligations of the offer must be printed in a type size half as large as the word 'free,' and all the terms, conditions, and obligations should appear in close conjunction with the offer of 'free' goods or services."); Utah Admin. Code R152–2–4 (1998) ("A 'free' or similar offer is deceptive unless all the terms, conditions, and obligations upon which receipt and retention of the 'free' item are contingent are set forth clearly and conspicuously at the outset of the offer so

The FTC Free Guidelines were held to be incorporated into a New York statute in *State ex rel. Abrams v. Stevens*, 130 Misc.2d 790, 497 N.Y.S.2d 812 (N.Y.Sup.Ct.1985). N.Y. Exec. Law § 63 (McKinney 1985) authorized the Attorney General to bring an action for "repeated fraudulent or illegal acts." New York courts had interpreted that clause to include authorizing actions for repeated violations of federal laws and regulations. *Stevens*, 497 N.Y.S.2d at 813. The court concluded that Stevens's conduct violated the Free Guidelines and, accordingly, § 63.

The FTC's analysis of "free" merchandise and service advertising was applied under a state statute similar to the Maryland Act in *Fineman v. Citicorp USA, Inc.*, 137 Ill. App.3d 1035, 92 Ill.Dec. 780, 485 N.E.2d 591 (1985). There a credit card issuer, as an incentive for cardholders immediately to accept an increase in the annual fee, offered those accepting the increase " '10 valuable extra services' . . . including 'free $100,000 common carrier travel insurance.' " *Fineman*, 92 Ill.Dec. 780, 485 N.E.2d at 592. Like Maryland's Act, the Illinois statute at issue in *Fineman* provided that, " '[i]n construing [the prohibition against deceptive trade practices] consideration shall be given to the interpretations of the [FTC] and the federal courts relating to Section 5(a) of the [FTC] Act.' " *Id.* at 780, 485 N.E.2d at 593–94 (citing Ill.Rev. Stat. Ch. 121–1/2, ¶ 262 (1981)). The *Fineman* court adopted and quoted the disjunctive rules set forth in the precursor to the Free Guidelines. *In re Walter J. Black, Inc.*, 50 F.T.C. 225. One of the alternate rules is:

---

as to leave no reasonable probability that the terms of the offer might be misunderstood.").

Mirroring the federal Free Guidelines, the Better Business Bureau adopted the following guidelines:

"The word 'free' may be used in advertising whenever the advertiser is offering an unconditional gift. If receipt of the 'free' merchandise or service is conditional on a purchase . . . the advertiser must disclose this condition clearly and conspicuously together with the 'free' offer (not by placing an asterisk or symbol next to 'free' and referring to the condition(s) in a footnote)."

Better Business Bureau Code of Advertising, Basic Principle 2 (visited Mar. 15, 1999) <http://www.bbb.org/advertising/adcode.html# Free>.

"The use of the word 'Free,' [is] an unfair or deceptive act or practice under the following circumstances:

"(1) When all of the conditions, obligations, or other prerequisites to the receipt and retention of the 'free' article of merchandise are not clearly and conspicuously explained or set forth at the outset so as to leave no reasonable probability that the terms of the advertisement or offer might be misunderstood."

*Id.* at 235–36 (cited at *Fineman,* 92 Ill.Dec. 780, 485 N.E.2d at 594).

The court concluded that there was no violation because the card issuer had clearly stated in its notice "that the insurance was available only to those cardholders who agreed to pay the higher fee. There was no *reasonable probability* that the offer would be misunderstood." *Fineman,* 92 Ill.Dec. 780, 485 N.E.2d at 594 (emphasis added).

■ For much the same reasons as those underlying our holding concerning the standard for determining if a practice is deceptive, we hold that a claim under the Act that an advertisement is deceptive because of its use of the word "free," or its equivalent, ordinarily should be decided by applying the same principles and rules that are applied by the FTC and the federal courts under § 5 of the FTC Act, including the principles and rules in the Free Guidelines.

### E. Section 13–301(1) and (3)

In this Part IV.E, we apply the principles and rules discussed above to the free airfare advertising by Luskin's.

The Court of Special Appeals found substantial evidence in the testimony of the customer witnesses that they "anticipated that, upon making their purchases, Luskin's would give them airline tickets, not an application for a travel package...." 120 Md.App. at 33, 706 A.2d at 118. This conclusion could only be reached by having equated lack of sophistication with lack of reasonableness. Under the circumstances here, a reasonable consumer could not expect to walk into any of the Luskin's locations, make a $200 purchase, and then have

Luskin's dispense two tickets for a flight to Florida, on the date, at the time, from the origin, to the destination and, perhaps, on the airline, that were chosen by the consumer. The advertisement targeted an audience of persons who would purchase $200 or more of electrical or electronic appliances, for home or office, including cellular telephones and computers. It would be obvious to nearly all in the targeted audience that Luskin's had not installed in each of its locations, for the period of the promotion, computer terminals connected to one or more airlines, servicing one or more airports in the three advertised destinations, in order to determine airline seat availability at the point of sale.

A closer question is presented by the Agency's alternate finding that "[t]he consumer could reasonably have believed that airline ... vouchers would be presented by Luskin's." This finding depends on a rule of law that permits reading out of the newspaper advertisement the disclosures that the "Vacations Premiums [are] Offered Through [VVI] Which is not affiliated with Luskin's" and that a "Minimum Hotel Stay [is] Required," as well as two statements that the reader "See Store For Details." The issue here is whether the reasonable consumer, knowing that there is no such thing as a "free lunch," will read the smaller type text or the brief television subtitle to learn what the "catch" is, or whether the reasonable consumer, acting on an impression of the advertisement as a whole, would not see or discern the significance of the disclosures in smaller type. We need not decide that question in the instant matter. There is substantial evidence to support the Agency's finding that the advertisement was a deceptive practice under the Free Guidelines, based on omissions of material matter, even if a consumer, acting reasonably under the circumstances, would read the entire ad.

Luskin's did not purport to be making an unconditional gift. Rather, there were two levels of conditions in the ad. The first condition, that specific minimum purchases from Luskin's were required, was fully set forth in the ad. At the second level were the conditions of VVI that the consumer must meet to get the "free airfare." Luskin's did not disclose the fifteen

dollar per person registration fee. The length of the required minimum hotel stays was not disclosed, so that a consumer reasonably might get the impression that a get-away weekend would qualify. Also not disclosed in the ad was the cost of the minimum stay, a factor which is clearly material to how "free" the airfare for two really was. There was substantial evidence to support the litany of omissions from the ad that were found by the Agency. See Part I, *supra*. Thus, the ad omitted information that would be important to the consumer and that likely affected consumer conduct.

■ On substantial evidence the Agency found that the failure of the free airfare ad to state material facts tended to deceive and was a deceptive trade practice, as described in § 13–301(3), and that it therefore violated § 13–303. The free airfare ad is not a separate violation of § 13–303 by virtue of the Agency's also analyzing the ad's shortcomings as implicit misrepresentations, described in § 13–301(1). That analysis simply refers to the same conduct by describing the other side of the same coin.

### V. Section 13–301(9)

■ Luskin's asserts that the Agency and the Court of Special Appeals have misinterpreted § 13–301(9) and that, if it is properly interpreted, Luskin's has not committed the deceptive practice therein described. Section 13–301(9) addresses acts of commission and of omission. The former are "[d]eception, fraud, false pretense, false premise, [and] misrepresentation," while the latter are "knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," all in connection with "[t]he promotion or sale of any consumer goods...." Luskin's contends that § 13–301(9) requires scienter, and we agree. The acts of commission proscribed by § 13–301(9), if read to be innocent misrepresentations, would be duplicative of § 13–301(1). Although the word "misrepresentation," unqualified, may mean either an intentional or an innocent misrepresentation, "misrepresentation" as found in § 13–301(9) is included in an enumeration of proscribed commissions, each of which con-

notes intentional misrepresentation. Consequently, under the rule of *ejusdem generis,* "misrepresentation" in § 13–301(9) should be given the same meaning as the accompanying terms.

The omissions proscribed by § 13–301(9) clearly require that the "concealment, suppression or omission of any material fact" be "knowing," as well as made "with the intent that a consumer rely on the same."

The Court of Special Appeals rejected the Luskin's argument by reading the phrase "the intent that a consumer rely on the same" as modifying § 13–301(9) in its entirety. *Luskin's,* 120 Md.App. at 35, 706 A.2d at 119. That is not the plain meaning of the words used. Further, if there were any ambiguity it is resolved by reference to the revision of the Act effected by Chapter 609 of the Acts of 1974, when present § 13–301(9) was added as § 20C(13). In relevant part the earlier statute read: "[W]ith the intent that consumers rely upon the concealment, suppression, or omission in connection with the promotion or sale...." Changing this language to "the same" during Code Revision did not effect a substantial change. The contrast between § 13–301(1) and (3) (scienter not required) with § 13–301(9) (scienter required) was pointed out in *Golt,* 308 Md. at 10–11, 517 A.2d at 333. *See also* Comment, *Maryland's Consumer Protection Act: A Private Cause of Action for Deceptive Trade Practices,* 38 Md. L.Rev. 733, 742 (1979). Thus, the Agency erred in its interpretation of § 13–301(9).

### VI. Section 13–305

Our grant of certiorari also embraced the construction of § 13–305. The section is long and complex, containing subsections (a) through (h), but the principal arguments involve subsections (a) and (b). They read:

"(a) *Exceptions.*—This section does not apply to:

"(1) Trading stamps, as defined by § 13–301 of the Business Regulation Article;

"(2) State lottery tickets issued under the authority of Title 9, Subtitle 1 of the State Government Article;

"(3) Retail promotions, not involving the offer of gifts and prizes, which offer savings on consumer goods or services including 'one-cent sales', 'two-for-the-price-of-one-sales', or manufacturer's 'cents-off' coupons; or

"(4) Games of skill competition not involving sales promotion efforts.

"(b) *Prohibition.*—A person may not notify any other person by any means, as part of an advertising scheme or plan, that the other person has won a prize, received an award, or has been selected or is eligible to receive anything of value if the other person is required to purchase goods or services, pay any money to participate in, or submit to a sales promotion effort."

Looking first to the statutory language, Luskin's contends that its free airfare promotion does not fall within the prohibition of subsection (b), even though a purchase is required, because the advertisement is directed to the public generally. Any member of the public as a whole who makes the qualifying purchase obtains a travel certificate. Luskin's does not notify a person that that person has "won a prize, received an award, or has been selected or is eligible to receive anything of value." Although the travel certificate may be something of value, Luskin's does not notify a person that he is "eligible to receive" it. Luskin's reads "eligible" to connote one's having been placed in some special category different from the public as a whole.

The Agency gives subsection (b) a much broader reading. It notes that § 13–101(b)(1) defines "advertisement" to mean "the publication, dissemination or circulation of any oral or written matter, including labeling, which directly or indirectly tends to induce a person to enter into an obligation...." Because subsection (b) prohibits notification "by any means" the Agency says that consumers are notified by the Luskin's ad. Hence, argues the Agency, inasmuch as notice includes notice by advertisement, subsection (b) does not require that the notice be sent to specific persons, as, for example, in direct mail advertising utilizing a mailing list. The Agency's brief

does not undertake to harmonize the other words in subsection (b) with the Agency's construction.

Each party reinforces its "plain meaning" argument by resort to legislative history. Present subsection (b) was originally enacted by Chapter 579 of the Acts of 1970 and codified as Maryland Code (1957, 1969 Repl.Vol., 1970 Cum.Supp.), Article 83, § 21D. When introduced as House Bill 141, the bill provided that "[t]he notification to any person by any means, as part of an advertising scheme or plan, that he has won a prize and requiring him to do any act, purchase any other item, or submit to a sales promotion effort" constituted an unlawful practice. 1970 Md. Laws at 1682. House Bill 141 was amended in the House Economics Matters Committee. The amendment additionally made unlawful notification that the person "received an award, or has been selected or is eligible to receive anything of value which is conditioned" upon a purchase or submitting to a sales promotion. *Id.;* 1970 Md. House J. at 479. The bill was further amended by the Senate Economic Affairs Committee to add the exception now found in subsection (a)(1) for trading stamps. 1970 Md. Senate J. at 1696.

The 1970 legislation presents the problem that has continued to bedevil § 13–305 as it was expanded over the years to the present time. Does present subsection (b) prohibit general advertising of any gift conditioned on a purchase, or are merchants who advertise that they give trading stamps outside of the reach of subsection (b) because no consumer has been notified in advance of any sale that they have won a prize or have become eligible to receive something of value. Phrased another way, is the "exception" for trading stamps necessary because of the breadth of the prohibition, or did some lobbyist, nearly thirty years ago, obtain a safe harbor for a trading stamp client who thereafter no longer needed to be concerned over how this Court might ultimately construe the prohibition's applicability to trading stamps?

The "exception" for state lottery tickets in present subsection (a)(2) was added by Chapter 347 of the Acts of 1975. The

title to the bill states that it is for "the purpose of allowing tickets for the State Lottery to be given away as part of a sales promotion." Subsection (a)(2) presents the same problem discussed above.

These two subsections, (a) and (b), that were in effect prior to 1975 were changed only in style, according to the Revisor's Note, in the adoption of the Commercial Law Article by Chapter 49 of the Acts of 1975. *See* 1975 Md. Laws at 532. That revision, however, substituted the "which is conditioned" upon purchase or submission language of the 1970 statute with "if the other person purchases an item or submits to a sales promotion." Md.Code (1975), CL § 13–305(b).

Provisions dealing with "a sales promotion effort relating to the sale, lease, or rental of real property not prohibited by this section," now codified as § 13–305(e), were enacted by Chapter 535 of the Acts of 1985.[9] Subsection (e) imposes certain disclosure obligations that are triggered "[w]hen a person offers prizes." This real estate subsection incorporates the problem discussed above by its reference to an offer that is "not prohibited by this section."

---

9. Section 13–305(e) reads in full as follows:
*"Required disclosures relating to sale, lease, or rental of real property.*—When a person offers prizes in a sales promotion effort relating to the sale, lease, or rental of real property not prohibited by this section, that person shall disclose to each offeree, in writing, clearly and conspicuously:

"(1) That the purpose of the sales promotion effort is to solicit the purchase, lease, or rental of real property;

"(2) The exact number of each prize offered in each category to be made available during the sales promotion;

"(3) The manufacturer's suggested retail price or comparable retail price of each prize offered;

"(4)(i) If calculable in advance, the odds against winning each prize; or

"(ii) If not calculable in advance, a statement to that effect, or that the odds of winning will be determined by the number of entries;

"(5) Whether all prizes offered will be awarded and when a determination of winners will be made; and

"(6) If prizes with retail prices or monetary values in excess of $100 are offered, where and when a list of winners of those prizes can be obtained."

The provisions that became present subsection (e) were introduced by Senator Levitan in the 1985 session as Senate Bill 369. The report of the Senate Judicial Proceedings Committee on that bill refers, as background, to the fact that "[m]any consumers have traveled several hundred miles in response to a solicitation promising valuable gifts, only to find that their 'prize' is an inexpensive trinket." It is far from clear what conduct of the type referred to in the Senate Report would be reached by subsection (e) but would not be prohibited under subsection (b).

The difference between the Luskin's and the Agency positions is at least consistent with both sections. Assume, for example, a general ad for a second home development in Garrett County which promises a free television to those who come to the site (so that they may be subjected to a sales solicitation). The television screen is two inches by two inches. If the Agency construction of subsection (b) is correct, then the general ad, plus the promise of a gift, plus the prohibited condition would have been unlawful under § 13–305 since 1970, and the real estate promotion subsection, enacted in 1985, would not have reached schemes that it apparently sought to reach. Alternatively, if § 13–305 did not reach the conduct because there was no representation to a specific consumer that that person had become eligible to receive a television, then the real estate promotion subsection would operate and require disclosures.

Also consistent with the Luskin's position is the following statement of policy in the Senate Report on Senate Bill 369:

"Businesses should be able to use gifts for sales promotion and consumers should be allowed to choose or receive the prizes offered in the promotions. However, the consumers must know before they expend their time and money, what conditions are attached to receiving the prizes offered in the sales promotion."

This is the policy of the FTC Free Guidelines that we applied under § 13–301(3), *supra.*

Section 13–305 was also substantially amended by Chapter 650 of the Acts of 1985, legislation introduced as House Bill 752. The report of the Senate Judicial Proceedings Committee on House Bill 752 states that "[t]he intent of the bill is to require disclosure of specified information to potential participants in contests, sweepstakes, and other prize-awarding events." This intent is accomplished by present subsections (g) and (h). Subsection (g) is triggered "[i]f a person offers a contest ... not prohibited by [§ 13–305], involving the award of prizes by chance." In that event certain disclosures must be made.[10] Subsection (h) has the same triggering provisions, other than that the contest must be one "not involving the award of prizes by chance."[11] Subsections (g) and (h) each

---

**10.** Section 13–305(g) reads in full as follows:

*"Required disclosures by entrants where prizes awarded.*—If a person offers a contest, sweepstakes, or other sales promotion effort not prohibited by this section, involving the award of prizes by chance, that person shall disclose to each offeree in writing:

"(1) The exact number of each prize offered in each category to be made available during the contest, sweepstakes, or sales promotion;

"(2) The manufacturer's suggested retail price, or comparable retail price, of each prize offered;

"(3) If calculable in advance, the odds against winning each prize and if not calculable in advance, a statement that the odds of winning will be determined by the number of entries;

"(4) Whether all prizes offered will be awarded and when a determination of winners will be made;

"(5) What, if any, conditions must be met in order to receive a prize;

"(6) If prizes with retail prices or monetary values in excess of $100 are offered, where and when a list of winners of those prizes can be obtained; and

"(7) That in order to receive the prize offered in the sales promotion you may not be required to:

"(i) Purchase goods or services;

"(ii) Pay any money; or

"(iii) Where applicable, submit to a sales promotion effort."

**11.** Section 13–305(h) reads in full as follows:

*"Required disclosures by entrants where no award of prizes made.*—If a person offers a contest, sweepstakes, or other sales promotion effort not prohibited by this section, not involving the award of prizes by chance, that person shall disclose to each offeree in writing:

"(1) The manufacturer's suggested retail price, or comparable retail price of each prize offered;

require disclosure of the "conditions" that must be met to receive the prize. Subsections (g)(5); (h)(2). The principal differences between subsection (b) on the one hand and subsections (g) and (h) on the other are (1) that the scope of the latter is not expressly limited by the prohibited conditions and (2) that the former requires a notification that the consumer "has won a prize . . . or is eligible to receive anything of value," while the latter two subsections deal with the disclosure rules that must be followed when the contest is offered, in advance of any purported winning or achieving of eligibility by the consumer.

Identical memoranda from the Agency separately submitted to the House Economic Matters Committee and to the Senate Judicial Proceedings Committee when each was considering House Bill 752 (as enacted, Chapter 650) reflect that the Agency position at that time was generally consistent with the Luskin's position in the matter now before us. Those memoranda advised:

> "Businesses want to use gifts as sales promotions and under House Bill 752 they will continue to be able to offer prizes as part of their promotions. House Bill 752 will simply require promoters to disclose the conditions of receiving those prizes *before* consumers spend their time and money."

Chapter 650 also added the exceptions found in ¶¶ (3) and (4) of subsection (a). Paragraph (3) appears to be internally contradictory. It applies to "[r]etail promotions, not involving the offer of gifts and prizes," which promotions include " 'two-for-the-price-of-one sales.' " There does not seem to be any

---

"(2) What, if any, conditions must be met in order to receive a prize; and

"(3) That in order to receive the prize offered in the sales promotion you may not be required to:

"(i) Purchase goods or services, unless the retail price of the prize is within the limits set by subsection (c) of this section;

"(ii) Pay any money; or

"(iii) Where applicable, submit to a sales promotion effort."

difference between the latter and a promotion advertising "Buy One—Get One Free," and thus involving a gift or prize. Over the years the Agency's resolution of this anomaly has been to construe the "exception" in subsection (a)(3) to permit a gift that is "functionally related" to the object or service sold.[12]

Subsection (a)(4) excepts from § 13–305 "[g]ames of skill competition not involving sales promotion efforts." There appears to be no difference between a sales promotion effort, which cannot be present for the exception of subsection (a)(4) to apply, and the essential element of "an advertising scheme or plan," set forth in subsection (b). Inasmuch as an essential element of subsection (b) must be missing for subsection (a)(4) to apply, subsection (a)(4) appears not to be an exception at all. The subsection (a)(4) provision strongly suggests that some interest group achieved its enactment as a safe harbor so that that group would not have to be concerned with how the Agency might enforce subsection (b).

Chapter 650 also sharpened the wording and expanded the scope of subsection (b) to read "if the other person is required to purchase goods or services, pay any money to participate in, or submit to a sales promotion effort." [13]

The most recent amendments to § 13–305 were made by Chapter 589 (Senate Bill 581) of the Acts of 1996. This was after the Agency filed its decision in the instant matter. The Legislative Services bill file on Senate Bill 581 demonstrates that the General Assembly was made aware of the Agency's decision. Senate Bill 746 of the 1996 session, that was not enacted, also has some relevance to the construction of § 13–305. The Agency argues that the outcome of these two bills in the 1996 session amounts to legislative agreement with the Agency's interpretation of § 13–305.

---

12. Query: At a bat night promotion at a professional baseball team's park, is the bat functionally related to the purchased permission to occupy a seat, assuming that patrons seated nearby are not unruly?

13. In addition, subsection (f), dealing with laws other than the Act that relate to the sale or rental of realty, was also added by Chapter 650.

As introduced, Senate Bill 581 would have repealed subsection (b) in its entirety. This proposal precipitated a lobbying campaign in favor of the bill by the Maryland Retailers Association and certain other retailers, and in opposition to the bill by the Agency. The debate resulted in a compromise pursuant to which subsections (c) and (d) of § 13–305 were enacted. Subsection (c) provides that subsection (b) "does not prohibit the offer of prizes requiring the person to purchase other goods and services if the retail price of the prize offered does not exceed" a certain formula.[14]

At the 1996 session the mercantile community was also advocating that the Circuit Court for Harford County correctly had construed subsection (b) in the Luskin's declaratory judgment case. After reviewing § 13–305 in its entirety, that court had concluded as follows:

> "All of these [sub]sections [of § 13–305], when read together ... indicate that the evil being attacked by this provision is advertisements that notify specific individuals that they have been selected to win a prize and not advertisements which combine two or more unlike items of merchandise or service in a single purchase price."

In the instant enforcement action the Agency ruled differently, holding that subsection (b) applied to general advertising.

---

**14.** Subsections 13–305(c) and (d) read as follows:

"(c) *Additional exceptions—In general.—*In addition to the exceptions provided in subsection (a) of this section, subsection (b) of this section does not prohibit the offer of prizes requiring the person to purchase other goods and services if the retail price of the prize offered does not exceed the greater of:

"(1) $40; or

"(2) The lesser of:

"(i) 20% of the purchase price of the goods or services that must be purchased; or

"(ii) $400.

"(d) *Same—Not applicable to award of prizes by chance.—*The exception provided in subsection (c) of this section does not apply to the offer of a prize requiring the person either to pay any money to participate in or to submit to a sales promotion effort, or to a prize promotion involving the award of prizes by chance."

Luskin's also had argued before the Agency in the instant matter that its free airfare promotion fell within the exception in subsection (a)(3). Applying its construction that the subsection (a)(3) exception applied only to items that are "functionally related," the Agency ruled that there was no functional interrelationship between appliances and free airfare. The "functionally-related" test similarly spilled over into the 1996 legislative session. Senate Bill 746 would have amended subsection (a)(3) to insert "whether or not unlike merchandise or services are combined in a single promotion." As part of the compromise, Senate Bill 746 was not enacted.

This legislative action and inaction, the Agency concludes, evidences the legislative intent that subsection (b) applies to general advertising, and that the subsection (a)(3) exception is limited to items that are "functionally related."

■ We hold that Luskin's did not violate § 13–305(b). Consequently, we need not decide how § 13–305(a)(3) is to be construed.

The interpretation of § 13–305(b) espoused by Luskin's and applied by the circuit court in the declaratory judgment case looks to all of the words of subsection (b) and gives those words their ordinary meaning. In the context of one's winning a prize, or receiving an award, or having been selected or found eligible to receive something of value, the words connote some process of selection which the one notified has successfully completed. In that context to "notify" one of that selection is to communicate in an individually directed fashion. By contrast, the Agency's reading of "notify" is not the ordinary meaning. After seeing a television ad, a person simply does not say, "I have just been notified that Unctious Used Cars is giving away a windshield ice scraper with each purchase." Moreover, the Agency's position gives no meaning to the representations that the one notified has won a prize, or received an award, or has been selected or is eligible to receive something of value. Only by ignoring those required representations, and by reading "notify" to include any adver-

tisement, does the Agency bring the advertisement of any gift or prize within the prohibition of subsection (b).

Further, from our review of the legislative history, we conclude that, when originally enacting subsection (b), the General Assembly did not intend for it to reach any ad offering a gift or prize conditioned on purchase or submitting to a sales promotion. By reading out of subsection (b) the element of a representation concerning some special selection, the Agency removes any requirement of deception. The conduct legislatively intended to be proscribed is a notification that combines, with one of the prohibited conditions from which the advertiser will benefit, a representation of special selection, when, in fact, the special selection is "part of an advertising scheme or plan." The way in which the Agency reads subsection (b), it can be violated by an advertisement that is truthful. The Agency's interpretation turns into a violator a merchant who has not increased the price of the item or service required to be purchased, has not reduced the quality of the gift or prize, and has fairly set forth the conditions in the advertisement. That cannot have been the legislative intent, and that is not how the Agency viewed the legislative intent during the first fifteen years of the Act's existence, as evidenced by the legislative history reviewed above.

The National Consumer Law Center has recognized that § 13–305 should be interpreted in the limited manner articulated above. Citing to the statute, the Center stated that "[i]t is deceptive to operate a contest or *otherwise specially select consumers* when the scheme is really designed to make contact with prospective buyers and special prices are not being offered." National Consumer Law Center, *Unfair and Deceptive Acts and Practices* § 4.6.6 (4th ed.1997) (emphasis added). In addition, the commentary refers to several sources from other states in which courts, legislatures, and administrative agencies prohibited the practice of informing consumers that they had been specially selected as prize winners.

The Agency's broad reading of § 13–305(b) is also inconsistent with the philosophy of § 13–306. That section was first

enacted by Chapter 516 of the Acts of 1971. In that provision the General Assembly contemplated that "a gift or other inducement [would be] offered to a customer in exchange for business." § 13–306(a). The statute requires that if the "gift or other inducement" is not available *"at the time the customer complies with the conditions attached to the offer,"* then the offeror is to give a certificate that is redeemable for the gift. *Id.* (emphasis added). The typical conditions for such an offer certainly include the purchase of some goods or services.

We recognize that the Agency's current interpretation of subsection (b) provides ease of enforcement. The Agency need only see if an ad offers, on a prohibited condition, a gift that is not "functionally related." This enforcement policy may well have accentuated the desirability for various interests to obtain legislative "exceptions." But these "exceptions" cannot alter the original meaning and intent of the core prohibition. Statutory exceptions from a prohibition that is not applicable do not retroactively enlarge the prohibition.

It may be that current public policy is to prohibit, on a *per se* basis, offers of prizes conditioned on purchases, where the prizes are above the monetary tolerances in subsection (c), even if the offers contain no representations of special selection. If that is the case, then the General Assembly may do so directly. That result is not achieved by creating an exception to a prohibition, the violation of which requires some representation in the advertising scheme or plan of special selection.

### VII. Special Defenses

Luskin's also contends that the circuit court was not required to give deference to the Agency's findings, including the Agency's finding that there was no accord and satisfaction and that the instant enforcement action was not a retaliatory or selective one. The arguments advanced by Luskin's are in substance an attempt to avoid the substantial evidence test. We reject the arguments for the reasons given by the Court of Special Appeals. *Luskin's,* 120 Md.App. at 38–41, 706 A.2d at 120–22.

### VIII. Breadth of Cease and Desist

Luskin's challenges the cease and desist provisions of the Agency's final order as being too broad, and we agree. Those provisions read as follows:

"1. Luskin's shall not use advertising that creates an overall impression about a particular matter that has the capacity, tendency or effect of deceiving or misleading consumers, or that fails to state any material fact if the failure deceives or tends to deceive consumers.

"2. If Luskin's makes a statement about a particular matter in an advertisement, it shall state all related material facts.

"3. All statements made in an advertisement relating to a particular matter shall be disclosed clearly and conspicuously. If any statement is given prominence in the advertisement, all related material statements shall be of equal prominence.

"4. All statements made in an advertisement relating to a particular matter shall be placed reasonably adjacent to each other.

"5 No statement made in an advertisement shall contradict or conflict with any other statement.

"6. No statement made in an advertisement shall be ambiguous or make any other statement ambiguous.

"B. Compliance with § 13–305

"7. Luskin's shall not violate Md. Com. Law Code Ann. § 13–305(b), which prohibits notifying consumers by any means, as part of an advertising scheme or plan, that consumers are eligible to receive anything of value, such as a prize, gift, or award, if the consumers are required to purchase any other goods or services, pay any money to anyone, or submit to a sales promotion effort. 'Anything of value' as used in this paragraph does not include a thing that is of negligible or *de minimis* monetary value.

"8. Luskin's may, as allowed by § 13–305(a)(3), conduct retail promotions which offer consumers monetary savings on the purchase of consumer goods and services. Such offers of monetary savings include manufacturer's 'cents off' coupons and price reductions for buying together two or more of the same or functionally related items, such as offering components of a system for a single price, 'two-for-the-price-of-one' sales and 'one cent' sales. Such offers do not include an offer to sell together two or more items that are not functionally related, such as airline tickets and appliances, as part of an advertising scheme or plan in

which one of the items is represented as 'free' or as a gift or prize.

"9. Luskin's shall make the disclosures required by Md. Com. Law Code Ann. § 13–305(c), (e), (f), and (g), when applicable."

 The Agency "has the power to prohibit not only continued use of past advertisements but also *future* acts that involve the same violation or unlawful practice. . . ." *Luskin's Inc. v. Consumer Protection Div.*, 338 Md. 188, 198, 657 A.2d 788, 792 (1995). The Agency is further authorized to issue an order requiring a violator "to take affirmative action." *See, e.g., Consumer Protection Div. v. Outdoor World Corp.*, 91 Md.App. 275, 290, 603 A.2d 1376, 1383 (1992) (recognizing Agency's power to require notices sent into Maryland of eligibility for prize to state "what the likelihood is that [recipients] will receive a prize of any significant value").

 The above-quoted order imposes requirements that go far beyond the deceptive practice in which Luskin's engaged in the instant matter. Paragraph nine of the order invokes provisions of the Act, violations of which were not even charged against Luskin's. Paragraph seven involves a violation, the charging of which we have held was based on an erroneous interpretation of § 13–305(b). Moreover, paragraph seven simply recites the language of § 13–305(b) and directs Luskin's not to violate it. Paragraphs one through six of the order go beyond the type of violation that Luskin's committed here. The violation here was the omission, before sale, of the disclosure of material facts relating to the conditions of the free airfare promotion. We assume that an order affirmatively requiring the disclosure of material conditions involving a promotion based on something being "free" would be proper. The vice in the instant order is that it applies to all advertising, without limitation as to the promotional theme, while at the same time directing Luskin's to comply with what amount to the general principles that are applied to determine whether a statement is deceptive.

*Standard Oil Co. v. FTC*, 577 F.2d 653 (9th Cir.1978), was a case of false advertising in the sale of gasoline. One provision of the order issued against Standard Oil directed it to cease and desist from

"using any pictorial or other visual means of communication with or without an accompanying verbal text which directly

or by implication creates a misleading impression in the minds of viewers as to the true state of material facts which are the subject of said pictures or other visual means of communication."

*Id.* at 661 n. 4. Although the deceptive trade practice in *Standard Oil* was in a simulation, the Court struck down the quoted provision and others like it. The court said:

"The order's generality adds to its burdensome character. Various paragraphs of the [FTC's] order are framed in language which amounts to a restatement of general principles of fair advertising. In effect the petitioners are simply enjoined from violating the law. The Supreme Court has expressly disapproved of such nonspecific FTC orders[.]"

*Id.* at 661 (referring to *FTC v. Henry Broch & Co.*, 368 U.S. 360, 367–68, 82 S.Ct. 431, 436, 7 L.Ed.2d 353, 358–59 (1962)) (footnote omitted).

*See also NLRB v. Express Pub. Co.*, 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930 (1941) ("[T]he mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged."); *Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518, 524 (1905) ("[W]e . . . are bound, by the first principles of justice, not to sanction a decree so vague as to put the whole conduct of the defendants' business at the peril of a summons for contempt. We cannot issue a general injunction against all possible breaches of the law."); *Harford County Educ. Ass'n v. Board of Educ.*, 281 Md. 574, 587, 380 A.2d 1041, 1049 (1977) (" 'Where the terms of an injunction are not specific and definite, a defendant will not be punished for contempt.' ") (quoting *Rocks v. Brosius*, 241 Md. 612, 648, 217 A.2d 531, 552 (1966)); *International Pocketbook Workers' Union v. Orlove*, 158 Md. 496, 511, 148 A. 826, 831 (1930) ("In so far as the injunctions may be so broad that their meaning and content depend upon the unpredictable views of the court in particular applications, they may operate as mere screens for subsequent *ex post facto* injunctions and punishments."); *Country Tweeds, Inc. v. FTC*, 326 F.2d 144 (2d Cir.1964).

Consequently, the cease and desist provisions of the Agency's final order should be modified on remand.

## IX. The Monetary Relief

We also direct that those portions of the Agency's final order awarding certain monetary relief be vacated and that a modified order, based on principles of restitution, be entered.

The final order deals with all customers who made qualifying purchases from Luskin's during the promotion period. Luskin's is ordered to provide two round trip airline tickets to the destination for which the purchaser qualified, and "[t]he terms of the tickets must be such that the consumer may use them without any charge and on any date of the customer's choice for one year after the date of issue," with departure from Baltimore or Washington. Alternatively, Luskin's is ordered to pay each eligible consumer the cash value of the tickets ranging from $479 for Florida to $1,454 to Hawaii. In addition, Luskin's is ordered to reimburse all eligible customers for money paid by the customer to VVI, except for payments for accommodations actually used. The final order established a claims procedure for the administration of the relief ordered.

It could not be more plain that the power of the Agency to award monetary relief in an administrative action brought by the Agency is limited to restitution. *See* § 13–204 ("[T]he [Agency] has the powers and duties to ... (10) [a]ssess against any violator ... damages which flow from the improper, incomplete or untimely restitution by the violator ...."); § 13–402(b)(1) (Any cease and desist order may include a condition for "(ii) [t]he restitution by the violator ... to the consumer of money, property, or any other thing received from the consumer in connection with a violation ...."); § 13–403(b)(1) ("[T]he [Agency] shall ... issue an order requiring the violator ... to take affirmative action, including the restitution of money or property."). If the Agency brings an injunction action, the court under § 13–406(c) "may enter any order of judgment necessary to ... (2) [r]estore to any person any money or real or personal property acquired from him by means of any prohibited practice...." *Compare* § 13–408 (dealing with "an action for injury or loss" brought by the consumer). This comparison between public and private actions has been drawn in consumer initiated actions.

*See CitaraManis v. Hallowell,* 328 Md. 142, 151–53, 613 A.2d 964, 968–69 (1992); *Golt,* 308 Md. at 12, 517 A.2d at 333.

In *Consumer Protection Div. v. Consumer Pub. Co.,* 304 Md. 731, 501 A.2d 48 (1985), we contrasted restitution, which was the relief in that proceeding, with a damage action, saying:

" 'The damages recovery is to compensate the plaintiff and it pays him, theoretically, his losses. The restitution claim, on the other hand, is not aimed at compensating the plaintiff but at forcing the defendant to disgorge benefits it would be unjust for him to keep. . . .

" 'Restitutionary recoveries often amount to about the same as the plaintiff's losses, and thus serve many of the compensatory purposes served by a damages recovery. The justification lies, however, in the avoidance of unjust enrichment on the part of the defendant.' "

*Id.* at 776, 501 A.2d at 71–72 (quoting Dobbs, *Law of Remedies* § 4.1, at 224 (1973)). *See also Bennett Heating & Air Conditioning, Inc. v. NationsBank of Maryland,* 342 Md. 169, 180 n. 4, 674 A.2d 534, 539 n. 4 (1996) (" '[R]estitution* is not *damages;* restitution is a restoration required to prevent unjust enrichment.' ") (citing 1 D. Dobbs, *Law of Remedies* § 4.1(1), at 557 (2d ed.1993)); *Magan v. Medical Mut. Liab. Ins. Soc'y,* 331 Md. 535, 542, 629 A.2d 626, 629 (1993) (" '[I]n enforcing restitution, the purpose is to require the wrongdoer to restore what he has received and thus tend to put the injured party in as good a position as that occupied by him before the contract was made.' ") (citing 5 A. Corbin, *Corbin on Contracts* § 1107, at 574 (1964) (footnote omitted)).

The Agency explains in its brief the rationale underlying its order that Luskin's pay what is apparently the retail value of two airline tickets, saying, "[B]y representing the airfare tickets as 'free' and by not disclosing the material costs, terms and conditions, Luskin's *did* promise to deliver to consumers more than the VVI travel package was actually worth." Brief of Respondent at 34. The Agency says that it is "providing relief to consumers by requiring Luskin's to give them what it promised. . . ." *Id.* This approach treats the Luskin's–eligible consumer relationship as if there were an enforceable contract that had been breached. As a remedy the Agency ordered loss of the benefit of the bargain, or expectation

interest, damages, *i.e.*, the difference between the value of that which was "promised" less the value of that which was received. The Agency's approach can also be analyzed as if there had been a tort of deceit. As a remedy the Agency ordered tort damages, which, in appropriate circumstances in a deceit action, may be measured by loss of the benefit of the bargain. *See Hinkle v. Rockville Motor Co.*, 262 Md. 502, 278 A.2d 42 (1971).[15]

In the matter now before us the relief ordered by the Agency is not rooted in restitution. The relief ordered is not limited to preventing unjust enrichment. In this "free" airfare promotion, Luskin's paid VVI for the travel certificates. Those consumers who presented the certificates to VVI paid an additional sum to VVI to participate in the process, and, if they pursued the vacation, they paid VVI for hotel and other accommodations. VVI likely booked hotel rooms and airline seats for the off season and at discounted rates. VVI's gross profit would be the total of the amounts paid to it by Luskin's and by the consumers less the amounts paid by it to the hotels and airlines. Further, the greater the attrition in the actual use of certificates issued by VVI, the greater is the VVI profit. In this somewhat myopic view of the transaction, Luskin's is out of pocket.

The enrichment to Luskin's, however, lies in the additional net profit that Luskin's may have made on an increase in sales of items of $200 or more during the period of the promotion over the sales in that price range that Luskin's otherwise would have made.[16] The appropriate remedy under the circumstances of this case is to require Luskin's to disgorge the net profit it realized from the deceptive practice. Accordingly, we shall vacate the monetary relief portion of the Agency's final order and remand to the Agency for the calculation of monetary relief focused on unjust enrichment.

It is, of course, the function of the Agency to fashion the final order. We note, however, that, inasmuch as the remedy seeks to have Luskin's disgorge net profits de-

---

**15.** We intimate no opinion whether, on the facts here, an action for deceit or breach of contract would lie.

**16.** The president of Luskin's testified that the promotion was "extremely successful."

rived from the deceptive promotion, the base that the Agency decides to use for determining any increase in net profits may be derived using periods of time when lawful promotions were being conducted by Luskin's. Further, mathematical precision is not required; reasonable approximations suffice. *See M & R Contractors & Builders, Inc. v. Michael,* 215 Md. 340, 349, 138 A.2d 350, 355 (1958).

Luskin's argues that, in order to effect restitution, the goods purchased by the eligible consumers must be returned to Luskin's. That is not an appropriate or practical application of restitution in the instant matter. We recognized in *Consumer Publishing* that "the plaintiff is generally required to disaffirm the contract and restore what he received under the bargain, or at least offer in good faith to restore it, before the defendant is required to restore what he received." 304 Md. at 777, 501 A.2d at 72. We also recognized that "[t]his requirement has been relaxed when the thing received by plaintiff is expected to be consumed, or from its very nature cannot be returned, or is worthless." *Id.*[17] In the instant matter the deceptive practice does not involve the goods themselves. Further, tender-back restoration is not practical, inasmuch as it would involve issues concerning the continued existence of the goods, the extent of the depreciation, whether the consumer would be required to pay the value of the use of the goods, and whether the consumer or Luskin's had the burden to deliver or to pick up. More important, the fallacy in this argument is that it does not consider the unjust enrichment of Luskin's.

There is a reliance element in restitution, *Consumer Publishing,* 304 Md. at 779, 501 A.2d at 73, and the parties here are at odds over the treatment of that element in the Agency's claim procedure. That procedure contemplates mailing a questionnaire to customers who, as identified from the records of Luskin's, made qualifying purchases during the promotion period. All questions are to be answered under affirmation. One question on that form asks if "one of the reasons" for the

---

**17.** *Consumer Publishing* involved the marketing of pills as diet pills. They were intended to be consumed and, thus, the relief in *Consumer Publishing* was return of the initial purchase price.

purchase was to get free airfare tickets. Luskin's contends that the question should be phrased as "but for" causation, but we have already rejected that argument in Part IV.C, *supra*. Luskin's also points out that it has many long term customers who always buy their appliances at Luskin's and whose purchases during the promotion period would have been purely coincidental. The Agency's response is that the claim form follows the procedure approved in *Consumer Publishing*, 304 Md. at 781, 501 A.2d at 74. There is, however, a significant difference between the advertising scheme in *Consumer Publishing* and that in the matter at hand. There the diet pills were available only through mail order so that reliance on the seller's advertising was inherent to a great degree in customer purchases. Here, purchases by those who did not rely on the ad at all should, in effect, be excluded from the award by determining the extent of unjust enrichment derived from increased sales of $200 or more.

On remand, the agency should delete from its order the provision alternatively requiring Luskin's to furnish airline tickets. Like the requirement that Luskin's pay 100% of the retail value of airline tickets, the provision exceeds any unjust enrichment to Luskin's. Indeed, both the monetary and the specific performance relief in the Agency's order could be viewed as punitive, but, if the Agency seeks a punitive assessment, it is to be accomplished by invoking the civil penalty provisions under § 13–410 or criminal penalties under § 13–411. *See Golt*, 308 Md. at 12, 517 A.2d at 333. A further deficiency in the specific performance alternative is that accommodating customer convenience makes administration of the cease and desist order so complex that court imposed sanctions for contempt based on alleged violations of the order are not realistic.

Further, on remand, the Agency will strike the provision that Luskin's pay to customers the amount paid by customers to VVI for other than accommodations. These monies were not received by Luskin's. Any benefit to Luskin's is embodied in net profits that are to be disgorged as unjust enrichment. The Agency argues that this provision in its order is like the direction to refund redemption fees charged to obtain prizes that was approved in *Consumer Protection Div. v. Outdoor World Corp.*, 91 Md.App. at 293, 603 A.2d at 1385. That was

a directive, however, issued to an advertiser–seller who had received the redemption fee.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE COURT OF SPECIAL APPEALS FOR THE ENTRY OF A JUDGMENT VACATING THE JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AND REMANDING THIS ACTION TO THE CIRCUIT COURT FOR HARFORD COUNTY WITH DIRECTIONS TO VACATE THE ORDER OF THE CONSUMER PROTECTION DIVISION AND TO REMAND THIS ACTION TO THE CONSUMER PROTECTION DIVISION FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.*

*COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID ONE–HALF BY LUSKIN'S, INC. AND ONE–HALF BY THE CONSUMER PROTECTION DIVISION.*

Judge CHASANOW joins only in Parts I through VIII of this opinion.

## ON MOTION FOR RECONSIDERATION

In a motion for reconsideration the Consumer Protection Division points out that in Part IX, "The Monetary Relief," this Court did not address § 13–402(b)(2). The section deals with conciliation. It provides that the Agency "shall ... attempt to conciliate the matter" of a violation, unless "violations are occurring which are causing immediate, substantial and irreparable injury." § 13–402(a)(1) and (2). If the circumstances of the violations are the latter, "the Attorney General may seek an ex parte or interlocutory injunction pursuant to § 13–406, without first attempting conciliation." Subsection (b) provides:

"(1) A written assurance of discontinuance, settlement agreement, or any cease and desist order provided for by this subtitle may include a stipulation or condition for:

"(i) The payment by the violator or alleged violator of the cost of investigation by the Division; and

"(ii) The restitution by the violator or alleged violator to the consumer of money, property, or nay other thing re-

ceived from the consumer in connection with a violation or alleged violation of this title.

"(2) These stipulations and conditions do not preclude the Division from using any other stipulation, condition, or remedy necessary to correct a violation of this title."

The Agency contends that the reference in (b)(2) to "any other ... remedy necessary to correct a violation" authorizes the Agency to order Luskin's to purchase airline tickets for, or pay the price of airline tickets to, each qualifying customer. Subsection (b)(2) makes it clear that there may be "stipulation[s and] condition[s]" that resolve part of a controversy between the Agency and an alleged violator, and that the Agency remains free to pursue "any other ... remedy" with respect to disputed aspects of the matter. Subsection (b)(2), however, should be read to mean any other statutorily conferred remedy. Simply as a matter of drafting it would be unusual to confer an open-ended power to order any relief, including monetary relief, "necessary to correct a violation," in a section primarily dealing with conciliation.

We also point out that nothing in our opinion directs how distribution is to be made of the amount to be disgorged by Luskin's under the principle of unjust enrichment. Nothing in our opinion requires a per capita distribution of the amount to be paid by Luskin's or prevents the creation of equitable classes of distributees, including conferring priority on those consumers who paid the $15 per person, nonrefundable processing fee to VVI.